IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| AMIR A. AL-DABAGH, | ) | CASE NO. |
| | ) | |
| Plaintiff, | ) | JUDGE |
| | ) | |
| v. | ) | **MEMORANDUM IN SUPPORT OF** |
| | ) | **MOTION FOR INJUNCTIVE RELIEF** |
| CASE WESTERN RESERVE | ) | |
| UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

NOW COMES Plaintiff Amir A. Al-Dabagh ("Al-Dabagh"), by and through the undersigned counsel, and respectfully submits this Memorandum in support of his Motions for Injunctive Relief.[1] After Plaintiff successfully completed all of the requirements of his medical school program at Defendant Case Western Reserve University ("CWRU") and paying CWRU over $140,000 in tuition costs for his medical degree, CWRU decided to expel Plaintiff just days before graduation. This case arises in order to rectify CWRU's unwarranted decision to refuse to grant Al-Dabagh his medical degree; CWRU's unwarranted decision to refuse to provide Plaintiff with his medical degree diploma; and CWRU's unwarranted decision to dismiss him as a medical student on April 18, 2014. The basis of CWRU's unwarranted decisions was Plaintiff's recent misdemeanor conviction for driving under the influence. For the reasons set forth below, this Court should grant Al-Dabagh the injunctive relief requested and enter a Temporary Restraining Order pending a full hearing on Al-Dabagh's Motion for Preliminary Injunction and/or a preliminary injunction pending a trial on the merits of Al-Dabagh's Verified Complaint.

---

[1] *See* Al-Dabagh's Motion for Temporary Restraining Order and MTD's Motion for Preliminary Injunction filed contemporaneously herewith.

I.     STATEMENT OF FACTS

CWRU is a private university in Cleveland, Ohio, comprised of ten colleges/schools, including the School of Medicine. CWRU identifies itself as a leading institution for academics and research, as well as one of the nation's top-ranked universities. Amir Al-Dabagh is a resident of Flushing, Michigan. (Exhibit 1, Declaration of Amir Al-Dabagh). As CWRU's records reflect, Al-Dabagh was an excellent student in high school, graduating in 2005 at the age of 16 second in his class with a 4.05 GPA, and at the University of Michigan – Flint, graduating in 2009 with a 4.0 GPA and a triple major. (Exhibit 2, CV of Al-Dabagh contained in CWRU file). In 2009, Al-Dabagh applied for admission into the CWRU School of Medicine and was accepted; he began as student at CWRU in the fall of 2009. (Ex. 1, Declaration).

The CWRU School of Medicine has a unique curriculum, which "unites the disciplines of public health and medicine into a single program of study. Key themes include flexibility, independent scholarship and research, self-directed learning and interactive teaching." (http://casemed.case.edu/about/). At all pertinent times, CWRU's School of Medicine maintained a student handbook (hereinafter "the Handbook"), which was provided to Al-Dabagh.[2] As such, the Handbook constituted an educational contract between CWRU and Plaintiff. The Handbook specifically and expressly provides the requirements that a student must satisfy in order for a student to receive a medical degree ("MD") from CWRU, and states:

> **Graduation Requirements**
>
> **In order to receive the MD degree from the Case Western Reserve University School of Medicine, students must:**
>
> 1.     Satisfactorily complete all Basic Science and Clinical components of the School of Medicine curriculum

---

[2] A complete copy of the Handbook is attached as Exhibit A to Plaintiff's Complaint. Plaintiff will attach the portions of the Handbook that are referenced in this Motion as separate exhibits hereto.

    2.  Pass the USMLE Step 1 and USMLE Step 2 CK and CS[3]
    3.  Satisfactorily complete their MD Thesis
    4.  Meet all financial obligations in a timely fashion to the University
    5.  Be approved to graduate by the Committee on Students

(Emphasis in the original). (Exhibit 3).

  The Handbook sets forth the Basic Course Work & Clinical components to be completed by a student. (Exhibit 4). The program includes scholarship, research and clinical work throughout the program. Generally, most of the students' first two years are spent in classroom, small group and private scholarship. During the third, fourth and optional fifth years of the program, the students are primarily engaged in clinical work and research. (Exhibit 1).

  Al-Dabagh, again, was an excellent student in the CWRU Medical School. He satisfactorily completed all of the scholarship, research, and clinical requirements. (Exhibit 5, Bursar's Statement). Moreover, he was informed by CWRU on April 10, 2014 that he would be graduating with distinction for his research skills. (Exhibit 6). As to the other requirements for receiving his MD, Al-Dabagh passed the USMLE, satisfactorily completed his MD thesis and met all financial obligations to CWRU in a timely fashion. (Exhibits 1, 5).

  The final graduation requirement – approval by the Committee on Students (hereinafter "COS") – is at the crux of this case. The COS is "a standing committee of the Faculty of Medicine charged with responsibility of reviewing the total performance of all students in the School of Medicine." (Exhibit 7, COS policy). It is composed of at least nine voting members and several *ex officio* members identified by title in the Handbook. The COS "is responsible for all determinations of promotion and graduation, repetition of a portion of the curriculum, and any sanctions including dismissal from the School."

---

[3] USMLE stands for the "United States Medical Licensing Examination" and the subparts are Clinical Knowledge ("CK") and Clinical Skills ("CS").

As noted, on April 10, 2014, CWRU sent Al-Dabagh a letter stating, in pertinent part, as follows:

> **Congratulations!** For your Honors with Distinction in Research achievement, you will receive a graduation award certificate. This certificate will be presented to you at Case Western Reserve University School of Medicine's Graduation Awards Ceremony and the ceremony will take place on: Saturday May 17, 2014 at 2:00 pm in the Strosacker Auditorium.

(Emphasis in original). (Exhibit 6). The letter was signed by five Deans of the School of Medicine, including three who are identified by title as members of the COS. (Exhibits 6, 7). As such, upon information and belief, the COS met and approved Al-Dabagh to receive his MD on or before April 10, 2014. At that point, both parties had performed all duties due and owning under the contract, and Al-Dabagh is entitled to be deemed as having received his MD.

During his four years at the CWRU School of Medicine (an optional 5th year was spent performing research at Wake Forest University in North Carolina), Al-Dabagh addressed issues before the COS three times. (Exhibit 1). The first time was in January 2012. Several days after a school event, the "Hippo Ball", a female student reported that she felt someone touch her buttock at the Ball and that when she turned she saw Al-Dabagh in the area.[4] Reports from the female students' friend and boyfriend conflicted as to whether a verbal altercation then ensued with the boyfriend. Al-Dabagh denied touching any student or any altercation. For his part, CWRU Dean C. Kent Smith, who attended the Ball, reported to the COS that he received no reports of any such event at the Ball. In addition, several other faculty members attended the Ball, and none reported seeing any such events.

---

[4] The statements referenced herein were provided by CWRU to Al-Dabagh in April 2014, and are mutually available to both parties. Plaintiff has not filed such statements to protect the identities of the witnesses. Plaintiff will file redacted copies upon request.

Following a cab ride home from the Ball, Al-Dabagh suffered a head injury upon exiting the cab.  When he awoke, his credit cards and money were missing.  (Exhibit 1).  Reports to the police and medical providers indicate that the cab driver claimed Al-Dabagh attempted to jump from the cab while it was travelling approximately 25 MPH.  As indicated in his medical records that night, Al-Dabagh vehemently denied any such accusation and maintains that he was the victim of a robbery.  Upon considering the information pertaining to the incident, the COS took no disciplinary actions towards Al-Dabagh, and instead referred him for an intervention on professionalism, which Al-Dabagh completed.  (Exhibit 8).

The second issue with the COS involved a clinical Internship in Internal Medicine from September 23, 2013 to October 20, 2013.  On or about November 1, 2013, Al-Dabagh completed what he understood would be a confidential and anonymous evaluation in which he expressed his dissatisfaction of the internship.  He was largely critical of the attitude of his supervising, attending physician.  Unbeknownst to Al-Dabagh, another physician at CWRU then spoke with the attending, who indicated he would complete his own official evaluation of Al-Dabagh.  Not surprisingly, the attending's evaluation was critical of Al-Dabagh's medical knowledge and interactions with other medical providers; though the evaluation did note that Al-Dabagh was "very polite and pleasant on rounds," "overall was okay with most families and patients," and that he saw "minor improvement" when issues were discussed with Al-Dabagh. Notwithstanding the attending's evaluation, Al-Dabagh received a satisfactory grade for the internship. (Exhibit 9). Of note, others involved with the internship, including another physician, one of the senior residents, noted that the criticisms of Al-Dabagh were "kind of unfair" and that Al-Dabagh's attending physician "did not provide him with guidance" and was not "re-directing him or teaching him what he would like done differently."  The other physician noted that once

she gave Al-Dabagh feedback as to specific complaints, "he changed immediately, and was actively seeking feedback." (Exhibit 10). The COS reviewed the issue and, on November 22, 2013, required Al-Dabagh to repeat the internship, to complete gender specific training and indicated that the addendum reflecting the decision would be added to his school record. (Exhibit 11). Al-Dabagh subsequently satisfactorily repeated the internship from December 16, 2013 to January 12, 2014 and completed the training.

Having completed all requirements to receive his CWRU medical degree, CWRU and the COS members issued the letter of April 10, 2014 to Al-Dabagh congratulating him on his achievements and alerting him that he would be receiving his graduation award certificate. (Exhibit 6). As such, the only possible conclusion is that these prior incidents did not rise to a level sufficient to CWRU to dismiss Al-Dabagh or otherwise refuse to recognize his MD.

However, eight days later, CWRU rescinded its decision to award Al-Dabagh a medical degree and diploma because, on April 7, 2014, Al-Dabagh was convicted under North Carolina General Statute 20-138.1 of Driving While Impaired ("DWI"), including Careless and Reckless Operation. (Exhibit 12). The conviction arose from a single-car accident in North Carolina on February 3, 2013, when Al-Dabagh swerved to miss a deer and ran into a utility pole. No other automobiles or people were involved in the accident. (Exhibits 11, 12). Al-Dabagh received the details of the conviction from his attorney on April 9, 2014. On April 11, 2014, he notified his future employers at Riverside Hospital in Columbus, Ohio, where Al-Dabagh is scheduled to begin a transitional year residency on June 17, 2014. Al-Dabagh was preparing to inform his Society Dean at CWRU, Dr. Robert Haynie, of the conviction when it came to Al-Dabagh's attention that, on or before April 14, 2014, Dean Haynie had been informed of the conviction by Riverside Hospital.

On April 14, 2014, the COS prepared a letter to Al-Dabagh indicating that, on April 17, 2014, it would hold a meeting "to review your progress in medical school and may issue sanctions…." (Exhibit 13). On April 17, 2014, the COS met to discuss Al-Dabagh.

On April 18, 2014, CWRU, by and through the COS, sought to recant its decision to award a medical degree to Al-Dabagh. On that date, CWRU issued a letter stating in pertinent that, "Amir Al-Dabagh will be dismissed from the medical school effective immediately, for continued and serious breaches in the code of conduct and standards of professionalism." (Exhibit 14). While CWRU characterizes its action as a dismissal, because Al-Dabagh has completed all of the requirements for obtaining his medical degree, CWRU's actions are more properly characterized as an attempt to revoke Al-Dabagh's degree. Moreover, CWRU has not identified the rule that Al-Dabagh allegedly violated. (Exhibit 1).

Al-Dabagh exhausted all administrative remedies by requesting an appeal for the COS to reconsider its decision. The appeal occurred on May 8, 2014, and was denied. On May 8, 2014, the COS issued a letter stating in pertinent part:

> Amir Al-Dabagh will be given the opportunity to withdraw, in writing, from the School of Medicine. If a letter of withdrawal is not submitted by Monday, May 19th, the student will be dismissed on grounds of failing to meet professional standards.

(Exhibit 15).

## II. LAW AND ARGUMENT

Al-Dabagh is entitled to a temporary restraining order and preliminary injunction in this matter in order to prohibit CWRU from refusing to grant Al-Dabagh his medical degree; refusing to provide Plaintiff with his medical degree diploma; and from dismissing Plaintiff as a medical student on April 18, 2014. A temporary restraining order is a provisional remedy issued to prevent the doing of some act until the propriety of granting a preliminary injunction can be determined. 56

O.Jur.3d, *Injunctions, 9.* Similarly, a preliminary injunction preserves the status quo pending a trial on the merits.

In reaching a determination under either request for relief, a court must consider similar factors. In reaching a determination on a request for a temporary restraining order, a court should consider whether:

1. the party seeking the injunction will suffer irreparable injury should the injunction not be granted;
2. the party seeking the injunction has no adequate remedy at law;
3. when, in balancing the equities, it appears that the party against whom the injunction is sought would not suffer significant injury should the temporary restraining order be granted; and
4. the public interest will be compromised.[5]

Similarly, the factors the Court should consider in determining whether an injunction should issue are:

1. the likelihood of the Plaintiff's success on the merits;
2. whether an injunction will prevent irreparable harm;
3. whether the potential injury that may be suffered by the Defendants will outweigh the potential injury that will be suffered by Plaintiff if the injunction is not granted; and
4. whether the public interest will be served by granting the injunction.[6]

No one single factor is dispositive; rather, the four factors must be balanced.[7] And, in this case, a review of the elements necessary for both the temporary restraining order and preliminary injunction supports the issuance of these orders in Plaintiff's favor.

### A. Al-Dabagh has demonstrated a substantial likelihood of success on the merits of his claims.

"The essential elements of a cause of action for breach of contract are the existence of a contract, performance by the plaintiff, breach by the defendant and resulting damage to the plaintiff." (Internal citation omitted.) *Winner Brothers, L.L. C. v. Seitz Elec., Inc.,* 182 Ohio

---

[5] *See Warner v. Central Trust Co.*, 715 F.2d 1121 (6th Cir. 1983).
[6] *See Certified Restoration Dry Cleaning Network v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007); *Six Clinics Holding Corp., II v. Cafcomp Systems, Inc.,* 119 F.3d 393, 399 (6th Cir. 1997).
[7] *Id.*; *See also Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003).

App.3d 388, 2009–Ohio–2316, 912 N.E.2d 1180, ¶ 31, s*ee also MMK Group, LLC v. SheShells Co., LLC*, 591 F.Supp.2d 944, 958 (N.D.Ohio 2008).

Private schools "have broad discretion in making rules and setting up procedures for their enforcement, nevertheless, under its broad equitable powers a court will intervene where such discretion is abused or the proceedings do not comport with fundamental fairness." *Geraci v. St. Xavier High School*, 1978 WL 195016, *3 (Ohio App. 1978), *citing Schippelrei v. Franklin University* (10th Dist.1967), 11 Ohio App.2d 6, 228 N.E.2d 334. Private universities are permitted "to make regulations, establish requirements and set scholastic standards largely as the responsible governing board shall decide." *Obukhoff v. Case W. Res. Univ.*, 2010 Ohio 1435, ¶19 (Ohio App. 2010). Courts will not interfere in the universities decisions on these matters "in the absence of a clear abuse of discretion by the governing board." *Id., citing Schoppelrei v. Franklin Univ.* (1967), 11 Ohio App.2d 60, 62, 228 N.E.2d 334.

The "clear abuse of discretion" standard implies "a lack of evenhanded justice in the administration of the private school's regulations…where there has been unnecessary oppression and unfair dealing…or…where there has been an expulsion that violates the purposes of the private educational contract." (Internal brackets and citations omitted). *Riley v. St. Ann Catholic School*, 2000 WL 1902430, *4 -5 (Ohio App. 2000), *citing Schoppelrei, supra.; Koblitz v. The Western Reserve Univ.* (1901), 21 Ohio C.C. 144, 158.

Al-Dabagh first seeks declaratory relief pursuant to 28 U.S.C. § 2201(a), which states in pertinent part, that "[i]n a case of actual controversy within its jurisdiction,...any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Moreover, "Further necessary or proper relief based on a

declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." See 28 U.S.C. § 2202.

In this case, Al-Dabagh is entitled to declaratory judgment that he has performed all duties due and owing to CWRU under the subject contract and that CWRU has issued a medical degree to him as of April 10, 2014. To the extent that CWRU has indicated that Al-Dabagh cannot use his medical degree until receiving a "diploma" (See Exhibit 6, April 10, 2014 letter), Al-Dabagh is further entitled to declaratory relief enjoining CWRU from denying him such a diploma.

In addition, CWRU's actions in "dismissing" Al-Dabagh from the School of Medicine constitute a breach of the subject contract. Al-Dabagh complied with all five requirements set forth by CWRU to obtain his medical degree diploma. Al-Dabagh satisfactorily completed Basic Science and Clinical components of the School of Medicine curriculum. (Exhibits 1, 5). He also passed the USMLE Step 1 and Step 2 CK and CS, and satisfactorily completed his MD thesis. Al-Dabagh met all financial obligations in a timely fashion to the University. (Exhibit 1).

Lastly, based upon CWRU's April 10, 2014 letter, and information and belief, CWRU's COS met and approved Al-Dabagh for graduation on or before that date. (Exhibit 6). Indeed, the letter states that Al-Dabagh was receiving his graduation award certificate for his Honors with Distinction in Research achievement. The letter was signed by five Deans of the Medical School (including four who are identified as members of the COS). Al-Dabagh performed under the contract. CWRU's purported dismissal of Plaintiff from its School of Medicine stands in stark contrast to their decision just a few days earlier, which indicated that Plaintiff had satisfactorily completed all requirements needed to obtain his medical degree. CWRU's purported dismissal of Plaintiff constitutes a material breach of its contract with Plaintiff.

Given CWRU's violation of the applicable contract, Al-Dabagh's dismissal constitutes an abuse of CWRU's discretion.  See *Riley*, 2000 WL 1902430 at *4 -5; *Schoppelrei, supra.; Koblitz*, 21 Ohio C.C. at 158.  Moreover, the principles of fundamental fairness do not support CWRU's disproportionately harsh actions towards Al-Dabagh in expelling him after he had completed all of the academic and other requirements necessary to obtain his medical degree.  Al-Dabagh does not dismiss the gravity of driving while legally intoxicated; however, it was external to CWRU as the conviction in North Carolina occurred while Al-Dabagh was completing a year of research at Wake Forest University. No one was injured in the accident and Al-Dabagh received Level IV misdemeanor sentencing with unsupervised probation and $340 in fines.  (Exhibits 1, 12). Moreover, Al-Dabagh underwent a voluntary substance abuse assessment in April 20013 which found no diagnosis identified for substance abuse; and Al-Dabagh completed the court-ordered DUI awareness program in May 2014.  (Exhibit 1). The DUI, simply put, cannot possibly be construed as reflecting on Al-Dabagh's professional and medical competence.

Moreover, CWRU's failure to follow its own internal policies demonstrates that it acted in an arbitrary and capricious manner.  Pursuant to the Handbook, the scope of the COS's review includes "professional attitudes and behavior as well as compliance with the university's Standards of Conduct."  "The [COS] acts on behalf of the Faculty of Medicine in non-academic disciplinary matters involving medical students. The [COS] will uphold the Standards of Conduct and Judicial Procedures as described in the [CWRU] Undergraduate Student Handbook." (Exhibit 16).  The Undergraduate Student Handbook provides, in pertinent part that, "Any member of the university community accused of violating a rule or regulation is entitled to adequate notice of all charges, to a fair hearing, and to protection of their educational

records. *Id*. Similarly, the COS policy in the Handbook provides that the student shall be informed "in writing of the issue(s) to be addressed…." (Exhibit 7).

In this case, Al-Dabagh was informed of the COS' recent intentions against him by letter dated April 14, 2014. (Exhibit 13). However, the letter informed Al-Dabagh simply that the COS "will review your **progress in medical school** and may issue sanctions…." (Emphasis added). *Id*. But by that time, Al-Dabagh had completed all of CWRU's graduation requirements and was home in Michigan waiting start his residency at Riverside Hospital in Columbus. In any event, no issue was brought to Al-Dabagh's attention as required by both the Handbook and the Undergraduate Student Handbook. *Id*. After completing its meeting, the COS issued its dismissal letter to Al-Dabagh dated April 18, 2014. In the letter the COS stated that "Al-Dabagh will be dismissed from the medical school effectively immediately, for continued and serious breaches in the code of conduct and standard of professionalism." (Exhibit 14). Again, this vague finding fails to provide Al-Dabagh with any notice of what he supposedly did wrong (much less the "adequate notice of all charges" as required by CWRU's Undergraduate Student Handbook) or justifying the extremely harsh sanction of dismissal. Lastly, on May 8, 2014, CWRU modified its grounds for the dismissal to include only "failing to meet professional standards." (Exhibit 15). Al-Dabagh has been left to guess why he is being expelled by CWRU, in violation of CWRU's internal policies and procedures noted above.

Moreover, the CWRU Standards of Conduct contain no standards that Al-Dabagh violated by being convicted of DUI. (Exhibit 17). Thus, the only possible conclusion is that that COS dismissed Al-Dabagh for being convicted of a DUI under the contrived notion that it somehow bore on his professionalism. As discussed, this is not a proper foundation for CWRU's improper actions. CWRU's decision to expel Plaintiff from its medical school program after he

had satisfactorily completed all requirements and just days away from graduation does not comport with fundamental fairness. CWRU has, accordingly, breached its contract with Al-Dabagh and abused its discretion in the application of its internal disciplinary procedures.

For these reasons, Al-Dabagh is substantially likely to prevail on the merits of his claims for declaratory judgment and for breach of contract against CWRU.

### B. Plaintiff Will Suffer Irreparable Harm Should Injunctive Relief Not Be Granted.

"Irreparable harm sufficient to justify injunctive relief is comprised of 'substantial injury to a material degree coupled with the inadequacy of money damages'."[8] "***[P]roving irreparable harm is not an absolute prerequisite to obtaining a preliminary injunction." *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 657 (6th Cir. 1996). Since the decision to grant a preliminary injunction is based upon the balancing of all of the factors, "the degree of proof necessary for each factor depends on the strength of the plaintiffs' case on the other factors." *Id.* Nevertheless, in this case, there can be no doubt that Al-Dabagh will be irreparably harmed if the requested injunctive relief is not granted.

In this case, Al-Dabagh will suffer irreparable harm that cannot be rectified with money damages. On June 17, 2014, Al-Dabagh has contracted to begin a one-year transitional residency at Riverside Hospital in Columbus, Ohio. The Riverside residency is highly competitive. Upon completing the Riverside residency, Al-Dabagh is also scheduled to begin a prestigious dermatology residency at the State University of New York ("SUNY") Downstate Department of Dermatology in the summer of 2015. The SUNY residency is contingent upon Al-Dabagh completing the Riverside residency.

If Al-Dabagh does not receive his medical degree on or before May 17, 2014, he will likely lose the Riverside residency. (Exhibit 1). At that point, Al-Dabagh's carefully planned career path in

---

[8] *Warner Amex Cable Communications, Inc. v. American Broadcasting Companies*, 499 F. Supp. 537, 547 (S.D. Ohio 1980), citing *Tully v. Mott Supermarkets, Inc.,* 337 F. Supp. 834, 850 (D.N.J. 1972).

dermatological medicine, which to date includes numerous publications, society memberships and contacts, will be effectively destroyed. Even if he is later awarded his degree, because of the termination of the Riverside residency, Al-Dabagh will be effectively unable to obtain a commensurate residency through the MATCH program, a ubiquitous program used by medical students nationwide to obtain medical residencies at respected institutions in the United States. Al-Dabagh will be effectively unable to receive the medical training he needs to be recognized as a world-class dermatologist. *Id*. No amount of money can compensate Al-Dabagh for the destruction of his unique career plans and dreams. See *Stenberg v. Cheker Oil Co.*, 573 F.2d 921 (6th Cir. 1978) (holding that irreparable harm from the loss of a business relationship may be established by proof of financial losses, including those "not measurable entirely in monetary terms.")

## C. Neither Defendant Nor Any Third Parties Will Be Harmed By The Granting of Injunctive Relief.

On or before April 10, 2014, the conditions to award Al-Dabagh a medical degree were met. The only changed circumstance at issue in this case is the DUI conviction of April 7, 2014. Al-Dabagh has recognized the seriousness of his actions and completed all court ordered treatment. Moreover, he underwent a substance abuse evaluation and was found to have no such issues. While the DUI conviction was admittedly a mistake, it does not adversely impact Al-Dabagh's ability to diligently, adequately, and professionally serve the patients and institutions with which he will be working. As such, neither CWRU nor any third parties will be harmed by granting the requested injunctive relief.

## D. Public Interest Will Be Served By the Granting Of Injunctive Relief

The United States Supreme Court has established a constitutional right to contract freely.[9] In addition, it is an established principle of Ohio law that upholding reasonable contracts is

---

[9] *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 572, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

generally in the public interest.[10] Based upon these principles, Al-Dabagh asserts that the public interest will be served by enforcing the terms of an Agreement which the parties entered into freely.

## III. CONCLUSION

Al-Dabagh is entitled to a temporary restraining order and preliminary injunction in this matter in order to prohibit CWRU from refusing to grant Al-Dabagh his medical degree; refusing to provide Plaintiff with his medical degree diploma; and from dismissing Plaintiff as a medical student on April 18, 2014. Plaintiff respectfully requests that this Court grant the requested injunctive relief so as to prevent Defendant from taking any further actions in violation of the contract it entered into with Plaintiff.

Respectfully submitted,

/s/ Peter A. Holdsworth
Peter A. Holdsworth (005211)
Christopher A. Holecek (0040840)
Patrick J. Quallich (0071337)
WEGMAN, HESSLER & VANDERBURG
6055 Rockside Woods Blvd., #200
Cleveland, Ohio 44131
Tel: (216) 642-3342 / Fax: (216) 520-0145
Email: CAHolecek@wegmanlaw.com
PJQuallich@wegmanlaw.com
PAHoldsworth@wegmanlaw.com

Mayer Morganroth
Morganroth & Monganroth
344 North Old Woodward Avenue, Suite 200
Birmingham, MI 48009
Tel: (248) 864-4000/Fax: (248) 864-4001
Email: mmorganroth@morganrothlaw.com

---

[10] *See Ratchford v. Proprietors' Insurance*, 47 Ohio St.3d 1, 8, 546 N.E.2d 1299 (1989) (holding that "persons have a fundamental right to contract freely with the expectation that the terms of the contract will be enforced.").

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing Memorandum in Support of Motion for Injunctive Relief was sent by Federal Express, freight prepaid, on this 14th day of May 2014 to:

Case Western Reserve University                      Defendant
C/O Peter M. Poulos, Chief Litigation Counsel and
      Chief Risk Management Officer
10900 Euclid Avenue
Cleveland, Ohio 44106-7020

                                              /s/ Peter A. Holdsworth
                                              One of the Attorneys for Plaintiff