# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| AMIR AL-DABAGH, | ) | CASE NO. 1:14-CV-01046 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | |
| | ) | |
| CASE WESTERN RESERVE | ) | |
| UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

_____

## DEFENDANT'S MEMORANDUM OF LAW IN RESPONSE TO PLAINTIFF'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF
_____

David H. Wallace (0037210)
Jennifer B. Orr (0084145)
Taft Stettinius & Hollister LLP
200 Public Square, Suite 3500
Cleveland, Ohio  44114-2302
Telephone: (216) 241-2838
Fax: (216) 241-3707
dwallace@taftlaw.com
jorr@taftlaw.com

Peter M. Poulos (0047210)
Chief Risk Management Officer
& Chief Litigation Counsel
Case Western Reserve University
10900 Euclid Avenue
Cleveland, Ohio 44106-7020
Telephone: (216) 368-0661
Fax: (216) 368-5481
peter.poulos@case.edu

*Attorneys for Defendant*

# TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

SUMMARY OF THE ISSUE TO BE DECIDED ......................................................... iii

SUMMARY OF THE ARGUMENT PRESENTED...................................................... iv

I.  Introduction .................................................................................................................1

II.  Statement Of Facts ....................................................................................................4

      A.     Plaintiff's History At The School Of Medicine ....................................4

      B.     Professionalism At The School Of Medicine ......................................11

III.  Discussion Of Law....................................................................................................14

      A.     Plaintiff Cannot Establish Success On The Merits Because It Is Clear That The University Was Within Its Rights To Make The Academic Decision To Dismiss Plaintiff From The School Of Medicine ...............................................15

      B.     There Is No Irreparable Harm .............................................................19

      C.     Forcing The University To Issue Plaintiff A Degree Would Harm The University And Others .................................................................................20

IV.  Conclusion .................................................................................................................20

CERTIFICATE OF SERVICE .........................................................................................22

CERTIFICATE OF COMPLIANCE PURSUANT TO LOCAL RULE 7.1(F)...........22

72973514.3

# TABLE OF AUTHORITIES

PAGE

## Cases

*Brown v. Rector and Visitors of Univ. of Virginia*, Case No. 07CV00030,
  2008 WL 1943956 *6 (W.D. Va. 2008) ................................................................. 15

*Carr v. Bd. of Regents of Univ. Sys. of Georgia*, 249 Fed.Appx. 146, 151
  (11th Cir. 2007)......................................................................................................... 15

*Ewing v. Michigan*, 474 U.S. 214, n. 13 (1985) ...................................................... 2, 17

*Fenje v. Feld*, 398 F.3d 620, 624 (7th Cir. 2005) .......................................................... 16

*Firester v. Board of Governors of Wayne State Univ.*, 908 F.2d 973 (6th
  Cir. 1990)................................................................................................................... 17

*Flaim v. Med. College of Ohio at Toledo*, Oh. Ct. of Cl. No. 2004-04132,
  2004 WL 2521293 *3 (Oct. 6, 2004)...................................................................... 16

*Hajjar-Nejad v. George Washington University*, Case No. 10-636 (CKK),
  2014 WL 1280228 *18 (D.D.C. Mar. 31, 2014) ............................................... 2, 16

*J-Rich Clinic, Inc. v. Cosmedic Concepts, Inc.*, 98 Fed. Appx. 444, 447
  (6th Cir. 2004)........................................................................................................... 19

*National Credit Union Admin. Bd. v. Lormet Comm. Fed. Credit Union*,
  Case No. 10 CV 1964, 2010 WL 4806794 *2 (N.D. Ohio Nov. 18,
  2010) ........................................................................................................................ 14

*Paulin v. George Washington Univ. School of Med. and Health Sciences*,
  Case No. 12-86(GK), 2014 WL 1755868 *3 (D.D.C. May 5, 2014) ................ 15, 19

*Pham v. Case Western Reserve Univ.*, 8th Dist. No. 71083, 1997 WL
  156689 *2 (Apr. 3, 1997)..................................................................................... 16, 17

*Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 106 S. Ct. 507
  (1985)......................................................................................................................... 15

*Reid v. Hood,* Case NO. 10CV2842, 2011 WL 251437 *2 (N.D. Ohio Jan.
  26, 2011) *2 ............................................................................................................ 14

*Rosenthal v. New York Univ.*, 482 Fed. Appx. 609, 614 (2d Cir. 2012)...................... 17

*State ex rel. The Miami Student v. Miami Univ.*, 79 Ohio St.3d 168, 680
  N.E.2d 956 (Ohio 1997) .......................................................................................... 18

## SUMMARY OF THE ISSUE TO BE DECIDED

A.  Whether Plaintiff Amir Al-Dabagh is entitled to a preliminary and permanent injunction requiring Defendant Case Western University to issue him a medical degree.

## SUMMARY OF ARGUMENT PRESENTED

A.  Plaintiff Amir Al-Dabagh is not entitled to injunctive relief because he cannot prove success on the merits because: (1) there is no contract between Plaintiff and Defendant created by the School of Medicine Student Handbook; (2) the School of Medicine's well-reasoned academic decision that Al-Dabagh did not fulfill the professionalism component of the curriculum is entitled to deference and should not be overturned; (3) Al-Dabagh will not suffer irreparable harm should he not receive a degree; and (4) the harm to third parties and the harm to the public interest outweigh any harm to Plaintiff.

Defendant Case Western Reserve  University (the "University") respectfully submits this memorandum of law in response to Plaintiff Amir A. Al-Dabagh's ("Plaintiff") supplemental memorandum in support of motion for injunctive relief ("Brief").

## I.    Introduction

In a misguided attempt to obtain the extraordinary remedy of a permanent mandatory injunction requiring the University's Medical School ("School of Medicine," "SOM" or "Medical School") to award him a medical degree which he is not qualified to receive, Plaintiff seeks to re-write the School of Medicine's Student Handbook ("Handbook") (attached hereto as Exhibit A), seeks to re-write the applicable legal precedent, and lastly seeks to rewrite his academic career at the School.

As part of his re-write of the Handbook, Plaintiff wants to magically delete from the Handbook all references to "Professionalism" as the first academic core competency in the School's curriculum; Plaintiff wants to delete from the Handbook the provisions that define a student as being professional when he "consistently demonstrates ethical, honest, responsible and reliable behavior" and "recognizes personal limitations and biases and finds way to overcome them;" Plaintiff wants to delete the Handbook's provisions that state the School's Committee on Students[1] ("COS") reviews "the total performance" of students, that such review "is not limited to the scores from examinations or performance in the clinical clerkships," that such review includes "professional attitudes and behavior," and that medical education includes "the demonstration of appropriate professional and interpersonal behavior, sensitivity, scope of responsibility and ethics;" and finally, Plaintiff seeks to delete from the Handbook the express requirement that in order to be awarded the MD Degree by the School, the student "must . . . be approved to graduate by the COS."

In place of the express language of the Handbook referenced above, Plaintiff wants to insert new language stating that medical education and academic performance are limited to test scores and didactic knowledge; that professionalism is limited in definition to only that behavior occurring within the classroom or clinical setting and that unprofessional behavior outside those settings does not count; that the COS cannot review a student's total performance including any unprofessional conduct occurring outside the classroom or clinical setting; and finally, that the COS has no academic discretion in the area of professionalism in deciding to whom to award a medical degree.

In addition to his re-write of the Handbook, Plaintiff wants to re-write the applicable legal precedent to claim that those decisions involving academic dismissals are limited in scope to poor didactic performance and never involve considerations of unprofessional behavior. Plaintiff wants to delete the litany of federal decisions in which federal courts have made pronouncements such as "particularly for medical students, professional comportment issues fall under the umbrella of deference to academic decisions." *See, e.g., Hajjar-Nejad v. George Washington University*, Case No. 10-636 (CKK), 2014 WL1280228 *18 (D.D.C. Mar. 31, 2014). Likewise, Plaintiff wants to delete the United States Supreme Court's pronouncements in *Ewing v. Michigan*, 474 U.S. 214, n. 13 (1985), in which the Supreme Court expressly noted that in deciding to dismiss the medical student for academic reasons, the University could reasonably consider behavior outside the classroom or clinical setting ("the University might have well concluded that Ewing's sensitivity to difficulties in his personal life suggested an inability to handle the stress inherent in a career in medicine" and that "the inordinate amount of time Ewing dedicated to his extracurricular essay writing may reasonably have revealed to the University a lack of judgment and an inability to set priorities."). While understandably troubled by this

---

[1] A roster of the current COS members is attached as Exhibit B.

applicable legal precedent, Plaintiff fails to offer any legal authority for his argument that unprofessional behavior outside the classroom/clinical setting is irrelevant to a medical student's academic performance, and that in such circumstances a court should order a mandatory injunction requiring the Medical School to award a degree despite the Medical School's professionalism concerns.

In addition to re-writing the Handbook and legal precedent, Plaintiff seeks to re-write the history of his career at the School. Despite his assertion to the contrary, the COS's decision to dismiss Plaintiff was not a disciplinary sanction for misconduct, but instead was an academic determination by the COS that Plaintiff did not meet the academic core curriculum competencies, i.e., professionalism. Indeed, the University does have a separate disciplinary process whereby a student may be disciplined for bad behavior and expelled by the University Judicial Board, which Board serves a different function than the COS. Plaintiff, however, did not go through that disciplinary process. Plaintiff also attempts to rewrite his career by suggesting that the COS's decision to dismiss him was premised solely on the drunk driving criminal conviction, and that his academic record was otherwise spotless. The COS's decision, however, was based on the totality of the circumstances, and included consideration of unprofessional conduct by Plaintiff that began in his first year, and continued unabated throughout his career. It was not solely the criminal conviction; that was merely one factor in the COS decision. Further, the decision was not based solely on the acts of unprofessionalism themselves; the COS decision was also premised on Plaintiff's repeated interactions with and statements to the COS on those matters that raised additional serious concerns about Plaintiff's ethics, integrity, and honesty. Among other re-writes of his career at the Medical School, is the one pertaining to Dr. Robert Haynie's 2011 recommendation letter. Plaintiff implies in his Brief

- 3 -

that Dr. Haynie believed Plaintiff was professional despite these incidents, but Plaintiff conveniently omits that such letter was drafted prior to the occurrence of such incidents.

At its core, Plaintiff's effort to re-write history is nothing more than an attempt to second-guess the unanimous academic opinion of the 9 senior faculty members of the COS that Plaintiff "was not fit to be a doctor," their "significant concerns about Plaintiff's honesty, integrity, self-reflection, overall professionalism," and their belief that he could not be "trusted with patient care as a medical doctor." (Affidavit of Susan Padrino, M.D.[2], attached as Exhibit C, hereinafter "Padrino Aff." at ¶ 29). Plaintiff's concocted excuses, his willingness to change his story to avoid responsibility, and his blatant omission of key information, was particularly troubling for the COS, raising the concern that he would continue with such unabashed behavior if awarded a medical degree. Indeed, the COS's concerns were borne out by Plaintiff's most recent request to the Court at the May 19 hearing that he be awarded a "temporary" medical degree so as to be able to represent to the Riverside Hospital the half-truth that he had a degree and thus was qualified to be a resident there. Plaintiff apparently intended to omit telling the Riverside Hospital that any such medical degree was temporary in nature and subject to revocation. In response, this Court indicated that Plaintiff should fully disclose these legal proceedings to the Hospital.

Based upon the foregoing, Plaintiff's revisionist attempts are insufficient to meet his clear and convincing burden of proof, and Plaintiff's Motion should be denied.

## II.   Statement Of Facts

### A.  Plaintiff's History At The School Of Medicine.

Plaintiff enrolled in the University's School of Medicine in the fall of 2009. (Compl. ¶ 6). Throughout Plaintiff's time at the University, he had numerous issues with professionalism,

- 4 -

and as a result, was brought before the School of Medicine's COS on three separate occasions. (Affidavit of Dr. Robert Haynie[3], attached as Exhibit E, hereinafter "Haynie Aff." at ¶ 3; Padrino Aff. ¶ 8).  Plaintiff repeatedly offered excuses for his behavior, which excuses changed over time, raising concerns about his honesty before the COS.   (Haynie Aff. ¶¶ 10, 17, 30; Padrino Aff. ¶ 8).

In January of 2012, Plaintiff was brought before the COS because of allegations surrounding his attendance at the School of Medicine's "Hippo Ball."  (Haynie Aff. ¶ 4; Padrino Aff. ¶ 9).  Plaintiff was accused of groping one student and propositioning a second.  (Copies of emails from students regarding these incidents are attached as Exhibit G)  In addition, after the Ball, Plaintiff was accused by a cab driver of refusing to pay his cab fare, and of jumping from the moving cab in order to avoid payment.  (A copy of the police report related to this incident is attached as Exhibit H).  Plaintiff claimed that he did not know what happened, but speculated that the cab driver may have tried to rob him and might have physically kicked him out of the car.  (Haynie Aff. ¶ 10).  Plaintiff initially told the COS that he had not consumed any alcohol that night, but changed his story years later.  (Id.)

During this COS review, another issue came to light regarding Plaintiff's lack of professionalism.  (Haynie Aff. ¶ 11).  During his "IQ" or Inquiry Group session, a small group problem-based learning class, Plaintiff was repeatedly late.  (A copy of Plaintiff's IQ Group Evaluation is attached as Exhibit I; see also Haynie Aff. ¶ 11).  More troubling, Plaintiff asked his group facilitator to not mark him tardy and to hide this fact from the School's faculty, knowing that his repeated tardiness could affect his grade.  (Id.)  Plaintiff did not initially offer

---

[2] The curriculum vitae of Dr. Susan Padrino is attached as Exhibit D.
[3] The curriculum vitae of Dr. Robert Haynie is attached as Exhibit F.

- 5 -

any excuse for this conduct, but years later told the COS that the blame lay with a prospective student staying with him, who overslept and made him late.

On February 16, 2012, the COS unanimously passed a motion stating that:

> The School of Medicine requires an intervention on professionalism, as agreed by me [Dr. Robert Haynie, Associate Dean for Student Affairs].  In addition, any further issues will result in them being reported and discussed at the COS Meeting with potential dismissal from Medical School."

(A copy of the February 16, 2012 letter is attached as Exhibit J).  This was not Plaintiff's last issue with professionalism, however.

In the fall of 2013, Plaintiff again was brought before the COS for professionalism issues. (Haynie Aff. ¶ 13, Padrino Aff. ¶ 11).  Plaintiff had been enrolled in an "acting internship," which is part of the School of Medicine's clinical curriculum.  (Haynie Aff. ¶ 14; Padrino Aff. ¶ 12).  At the end of his acting internship, Plaintiff was given a passing grade but "with concerns" with regard to professionalism due to various complaints made by hospital staff about Plaintiff. (A copy of the November 1, 2013 evaluation email is attached as Exhibit K).  Plaintiff's unprofessional treatment of staff and in front of patients actually led to Plaintiff being kicked out of the hospital room by the patient's family.  (Id.)  In addition, Plaintiff repeatedly misrepresented to his clinical preceptor that he had done his pre-round check of patients when in fact he had not done so.  (Id.)  Plaintiff's excuse this time was that no one told him he was being unprofessional.

As a result of these concerns, Plaintiff was once again brought before the COS.  (Haynie Aff. ¶ 19).  It should be noted that during this review, the COS gave serious consideration to dismissing Plaintiff at that point but decided to give him another chance.  (Padrino Aff. ¶ 14). As a result, on November 21, 2013, the COS passed a motion stating that:

- 6 -

> Amir Al-Dabagh will be required to repeat the Internal Medicine
> Acting Internship based on initial poor performance and complete
> gender specific training as outlined by Kathy Cole-Kelly and Dr.
> Haynie.  The results will be reviewed with COS at the January
> 2014 meeting, and an addendum will be made to the MSPE
> reflecting the student's professional behavior.

(A copy of the November 22, 2013 letter informing Plaintiff of the motion is attached as Exhibit

L).

A Medical Student Performance Evaluation letter, or MSPE, is issued by the Medical

School and is given to all prospective residency programs.  (Haynie Aff. ¶ 21).  An addendum to

an MSPE is extremely rare, and is usually a signal to prospective residency programs that there

are potential issues with a student.  (Id.)  Dean Haynie had never before written such an

addendum for a student.  (Id).  Realizing the possible negative effect of an addendum to his

MSPE, Plaintiff appealed the COS decision.  (Haynie Aff. ¶ 22; Padrino Aff. ¶ 16).  A copy of

Plaintiff's MSPE letter is attached as Exhibit M.

On December 19, 2013, the COS informed Plaintiff that it would not change its decision

with regard to his MSPE.  (A copy of the December 19, 2013 letter is attached as Exhibit N).

Plaintiff appealed again, this time to the Dean of the School of Medicine, who allowed Plaintiff a

chance to be heard again by the COS with a faculty member in attendance on his behalf.

(Haynie Aff. ¶ 24; Padrino Aff. ¶ 18).  After this second appeal, on January 30, 2013, the COA

again reaffirmed its decision to issue an addendum to Plaintiff's MSPE, because "[t]he

Committee has observed a pattern of unprofessionalism with regard to communication and

personal conduct."  (A copy of the January 30, 2014 letter is attached as Exhibit O).

Unbeknownst to the University, on February 3, 2013, almost a year prior to Plaintiff's

appeal, Plaintiff was arrested on suspicion of driving while impaired ("DWI") in North Carolina,

after a single car accident.  (Haynie Aff. ¶ 26; Padrino Aff. ¶ 20).  Plaintiff was in North Carolina

- 7 -

on behalf of the School of Medicine as a medical student performing research for another institution.  While Plaintiff claims that he was not there on behalf of the University, he was enrolled in the School of Medicine at that time, he earned research credit for his work, and it was this work for which he received a research award from the School of Medicine.  (Haynie Aff. ¶ 27).  Plaintiff was found guilty of DWI, Careless & Reckless Operation, and Hit & Run on April 7, 2014.  (A copy of an April 9, 2014 letter from Plaintiff's criminal lawyer is attached as Exhibit P).

At no time during the pendency of his criminal case, after his conviction, or during his appearances before the COS, did Plaintiff report the issue to the University.  (Haynie Aff. ¶ 29; Padrino Aff. ¶ 23).  During the pendency of his criminal matter, Plaintiff had repeated interactions with Dean Haynie and the COS about his professional behavior, about taking responsibility for his behavior, and about taking steps to be more professional.  (Haynie Aff. ¶ 29).  Despite these communications, Plaintiff omitted any mention of his drunk driving, his pending criminal case, or subsequent conviction.  (Id. ¶ 29).  The COS had concerns about Plaintiff's concealment of facts given that Plaintiff was meeting with the COS about his previous lack of professional behavior and plans to address that behavior at the same time his criminal matter was pending, yet failed to mention this critical information.  (Padrino Aff. ¶ 23).  This failure to notify the School of Medicine was a violation of both the School's professionalism standards and the oath of professionalism that Plaintiff took upon enrollment at the School.  (A copy of the oath of professionalism is attached as Exhibit Q; see also Haynie Aff. ¶ 29; Padrino Aff. ¶ 23).  Instead of hearing of the criminal case from Plaintiff, the University was informed of Plaintiff's conviction when, around April 8 or 9, 2014, the director of Plaintiff's upcoming residency at Riverside Hospital called Dean Robert Haynie to discuss the matter, assuming that

- 8 -

Dean Haynie already knew of the problem.  (Haynie Aff. ¶ 30; Padrino Aff. ¶ 24).  Dean Haynie then called Plaintiff, who claimed that he was going to tell Haynie, but that Haynie had called him first.  (Haynie Aff. ¶ 30).  However, this claim is not believable, given Plaintiff's pattern of repeated excuses and willingness to conceal information in the past.  (Id.)  Plaintiff also offered up the excuses that the accident was not caused by his being drunk but because he swerved to miss a deer; that he did not tell the School because his attorney told him not to tell the School; and that he did not tell the School because he thought he could beat the criminal arrest by challenging the blood alcohol test.  (Id.)

As a result, Plaintiff was brought before the COS again on April 17, 2014.  At that time, the COS passed the following motion:

> Amir Al-Dabagh will be dismissed from the medical school effective immediately, for continued and serious breaches in the code of conduct and standards of professionalism.

(A copy of the April 18, 2014 letter informing Plaintiff of the motion is attached as Exhibit R). Plaintiff appealed.  (Haynie Aff. ¶ 32; Padrino Aff. ¶ 26).  The COS unanimously upheld its decision, but amended it to allow Plaintiff the option to withdraw instead of being dismissed.  (A copy of the May 8, 2014 letter informing Plaintiff of the decision is attached as Exhibit S).  The COS gave Plaintiff the option to withdraw as a means to offer him the opportunity to seek admission to another medical school, if such school deemed Plaintiff capable of remediating his professionalism issues.  Plaintiff was offered the option to appeal to the Dean of the School of Medicine, and was informed that if the Dean upheld his appeal, his degree could be awarded with a retroactive date of May 18, 2014.  (Haynie Aff. ¶¶ 32-33; Padrino Aff. ¶¶ 26-27). Plaintiff declined to appeal, stating that he had no procedural grounds upon which to appeal. (Id.)

- 9 -

The COS's decision to dismiss Plaintiff was not a form of discipline for bad behavior. (Haynie Aff. ¶ 34; Padrino Aff. ¶ 30).  In fact, the University has a separate judicial process, and a separate University Judicial Board, that can be utilized to discipline and expel a student for bad behavior that violates the University's overall Standards of Conduct.  (Id.)  In the past, there have been medical students who have gone through that separate disciplinary process and have been expelled by the University Judicial Board for bad behavior.  (Haynie Aff. ¶ 34).  Plaintiff, however, did not go through that disciplinary process.

Instead, the COS's decision was an academic decision based on Plaintiff's failure to meet one of the core competencies of the academic curriculum – Professionalism.  (Haynie Aff. ¶ 34; Padrino Aff. ¶ 28).  The basic science and clinical components of the curriculum include the core competencies and Plaintiff did not complete these requirements due to his lack of professionalism.  (Padrino Aff. ¶ 28).  The COS decision was based on the totality of circumstances of Plaintiff's academic career at the School; it was not limited to one single factor and it was not based solely on the criminal conviction.  Instead, it was based on the repeated unprofessional acts, as well as Plaintiff's interactions with and statements to the COS, that included concocted excuses, changing stories, and a lack of any acceptance of responsibility, all raising further concerns about Plaintiff's ethics, integrity and honesty.  (Id. ¶ 29).  The COS unanimously concluded that Plaintiff was not fit to be a doctor and represented a risk to patient safety.  (Id.)  Plaintiff's behavior outside the classroom and clinical setting, including his drunk driving and criminal behavior, were all properly considered by the COS as they directly relate to his professionalism. (Id. ¶ 30).  The COS review of Plaintiff's behavior is similar to other medical students who have been reviewed by the COS for a lack of professionalism based on alcohol-related or other concerning conduct that occurred outside the classroom or clinical

- 10 -

settings. (Haynie Aff. ¶ 34). These students have likewise faced COS decisions ranging from warnings to dismissal. (Id.)

Plaintiff cites to certain recommendation letters from Dean Haynie as evidence that he acted professionally and that the School of Medicine faculty thought he was a suitable candidate for a degree. However, one of the two Haynie reference letters was written before Plaintiff was ever brought up for review by the COS. (Haynie Aff. ¶ 35). The other was written prior to Plaintiff's second and third reviews by the COS. (Id.) At this point, Dean Haynie has made clear that he would not give Plaintiff a recommendation letter with respect to his meeting of the School of Medicine's professionalism standards. (Id.)

**B. Professionalism At The School Of Medicine.**

The School of Medicine emphasizes the need for professionalism amongst its students from day one of medical school. (Padrino Aff. ¶ 5). The requirement that students act professionally remains in place until graduation day. (Id.) This includes behavior both inside and outside of the clinical and classroom setting. (Id.) Indeed, the ability of a student to obtain a clinical rotation during medical school, the ability of a medical student to obtain a residency, and the ability of a physician to maintain his license can all be negatively impacted by unprofessional behavior that occurs outside of the clinical setting. (Id.)

The Handbook lays out the School of Medicine's Core Competencies. The very first of the nine Core Competencies listed is "Professionalism." (Handbook, Curriculum Section). The Handbook defines what a student must demonstrate to achieve "Professionalism:"

- Consistently demonstrating ethical, honest, responsible behavior.

- Identifies challenges to professionalism and develops a strategy to maintain professional behavior…

- 11 -

- Recognizes personal limitations and biases and finds
  ways to overcome them…

(Handbook, Appendices).

In addition, the Handbook states that:

> Medical school education entails the mastery of didactic,
> theoretical, and technical material, as well as the demonstration of
> appropriate professional and interpersonal behavior, sensitivity,
> sense of responsibility, and ethics, and the ability to conduct
> oneself suitably with patients, colleagues, co-workers, and others.
> Unprofessional activities may also be subject to a formal university
> disciplinary action.

(Handbook, Section on Committee on Students).

The Handbook further provides that "[a]t CWRU School of Medicine . . . professionalism is valued equally as highly as mastery of the basic sciences and clinical skills . . . When the SOM confers the M.D. degree, the faculty is attesting not only the student has achieved a level of competency as measured by performance on tests, but that the student has also shown a commitment to professional responsibility…" (Handbook, Section on Additional Policies).

The Handbook sets forth the requirements for the award of the M.D. Degree:

1. Satisfactorily complete all Basic Science and Clinical components of the School of Medicine curriculum

2. Pass the USMLE Step 1 and USMLE Step 2 CK and CS

3. Satisfactorily complete their MD thesis

4. Meet all financial obligations in a timely fashion to the University

5. Be approved to graduate by the Committee on Students.

(Handbook, Section on Additional Policies Regarding Completion of Program).  In order to fulfill element one above, a student must complete all Basic Science and Clinical components of the curriculum, and those components expressly include professionalism.  (Padrino Aff. ¶ 4).

- 12 -

The COS did not approve Plaintiff for graduation.  (Padrino Aff. ¶ 28).  The COS's decision on which fourth year medical students to be approved for graduation was made at a meeting after the COS had already decided to dismiss Plaintiff.  (Id.)  As a result, Plaintiff was not included on the COS's list of approved graduates.  (Id.)  Despite Plaintiff's attempt to characterize it as such, the letter sent to Plaintiff congratulating him on his research award was not the COS approval for graduation.  (Id.)

Pursuant to the Handbook, the COS is "charged with the responsibility of reviewing the total performance of all students in the School of Medicine."  (Handbook, Section on Committee of Students).  "Review of student performance within the curriculum is not limited to the scores from examinations or performance in the clinical clerkships."  (Id.)  "Review by the Committee on Students includes professional attitudes and behavior…"  (Id.)  Further, "[t]he Faculty of Medicine delegates to the Committee on Students the faculty's authority for decisions on student standing and student promotions and graduation."  (Id.)  "The Committee on Students also recommends to the Faculty of Medicine candidates for the award of the degree of Doctor of Medicine."  (Id.)  The COS makes the decision as to which students to recommend for an award of the degree of Doctor of Medicine, and no student receives this degree from the School of Medicine without such a recommendation.  (Padrino Aff. ¶ 4).

Moreover, the Handbook indicates that criminal behavior implicates professionalism.  (Handbook, Section on Other Policies, & Resources for Rules, Regulations, and Policies).  Further, per the Handbook, "[a]ll current students are required to notify their Society Dean of any new misdemeanor or felony convictions . . ."  (Id.)  Plaintiff did not do so.  Other institutions also understand that criminal behavior implicates professionalism, and this is why the Association of American Medical Colleges has a criminal background question on its standard

- 13 -

admission application, this is why hospitals conduct criminal background checks on potential medical residents, and this is why state medical boards take action against physician licenses for criminal behavior such as drunk driving.  (Haynie Aff. ¶ 36; Padrino Aff. ¶¶ 5, 30).

As is made abundantly clear by the Handbook, the School of Medicine places a great deal of emphasis on a student's attitude and behavior, including the student's ability to act as a caregiver, a student's ability to take responsibility for his actions and mistakes, and a student's ability to act cooperatively as a member of the health care team.[4]  The School of Medicine recognizes that to adequately protect the health of a patient, a physician must be much more than a person with knowledge of the basic medical science.

## III.  Discussion Of Law

To get a permanent injunction, a plaintiff must show (1) actual success on the merits; (2) a substantial threat that the plaintiff will suffer irreparable injury without the relief requested; (3) that the threatened injury outweighs any damages that the injunction may cause to others; and (4) that the injunction would serve the public interest.  *National Credit Union Admin. Bd. v. Lormet Comm. Fed. Credit Union*, Case No. 10 CV 1964, 2010 WL 4806794 *2 (N.D. Ohio Nov. 18, 2010).  "An injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Reid v. Hood*, Case No. 10CV2842, 2011 WL 251437 *2 (N.D. Ohio Jan. 26, 2011).  Because Plaintiff cannot establish success on the merits or irreparable harm absent the injunction, and because granting Plaintiff injunctive relief could cause substantial harm to others or to the public interest, this Court should deny Plaintiff's motions.

---

[4] Indeed, the State Medical Board of Ohio also recognizes the need for professionalism.  A copy of pages from the State Medical Board of Ohio Report for the Summer of 2006 is attached as Exhibit T.

72973514.3

**A.      Plaintiff Cannot Establish Success On The Merits Because It Is Clear That The University Was Within Its Rights To Make The Academic Decision To Dismiss Plaintiff From The School Of Medicine.**

The University disputes whether or not a contract even exists between Plaintiff and the University.  Plaintiff claims that the Handbook constitutes a contract between the parties.  However, on the very first page of the Handbook, in the forward, it states that:

> This publication should not be construed as an offer or contract between the University and any person.  The University has the right to amend, add, or delete any information in this publication, including any course of study, program fee or regulation of the University.  Policies and regulations listed in this Handbook are subject to change at any time throughout the academic year.

More than one federal court has held that where such disclaimer language exists, there cannot be a contract.  *See Carr v. Bd. of Regents of Univ. Sys. of Georgia*, 249 Fed.Appx. 146, 151 (11th Cir. 2007); *Brown v. Rector and Visitors of Univ. of Virginia*, Case No. 07CV00030, 2008 WL 1943956 *6 (W.D. Va. 2008) (finding that a graduate handbook was at best an illusory contract where there was similar disclaimer language).

Moreover, even if a contract did exist between Plaintiff and the University, Plaintiff still cannot establish success on the merits because it is clear that the University made the academic decision to dismiss Plaintiff from the School of Medicine after a myriad of professionalism issues.

It is well-established that courts should not second guess the academic decisions of universities, but instead those decisions should be shown great respect by the law.  *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 106 S. Ct. 507 (1985) (judges "may not override [a genuinely academic decision] unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment); *Paulin v. George Washington Univ. School of Med. and Health*

- 15 -

*Sciences*, Case No. 12-86(GK), 2014 WL 1755868 *3 (D.D.C. May 5, 2014) (same); *Pham v. Case Western Reserve Univ.*, 8th Dist. No. 71083, 1997 WL 156689 *2 (Apr. 3, 1997) (same); *Flaim v. Med. College of Ohio at Toledo*, Oh. Ct. of Cl. No. 2004-04132, 2004 WL 2521293 *3 (Oct. 6, 2004) (same); *Hajjar-Nejad, supra,* at *18 ("When a school issues a diploma to one of its students, it certifies to society that the student is well-versed in all of the knowledge and skills required by his or her chosen profession.  Thus, to ensure society's confidence in the qualifications of individuals who have graduated from a particular educational institution, it is essential that the decisions surrounding the issuance of these credentials be left to the sound judgment of the professional educators who monitor the progress of their students on a regular basis").

While Plaintiff incorrectly attempts to characterize the COS's decision to dismiss him as a "disciplinary," rather than an academic decision, the law does not support this contention.  "An academic dismissal is one that involves a school's determination of whether a student will make a good doctor, and the school's consideration of a student's personal attributes . . . may permissibly factor into this 'academic' decision."  *Fenje v. Feld*, 398 F.3d 620, 624 (7th Cir. 2005).  As the 7th Circuit held in *Fenje*:

> Where a plaintiff conceals past blemishes on his record, there is "no difficulty in concluding that [plaintiff's] dismissal falls within the ambit of an academic dismissal . . . [because Defendant] made a professional judgment that a doctor-in-training who has demonstrated a willingness to withhold damaging information when it serves his purposes cannot be fully trusted to convey all information crucial to the health of the patients committed to his care . . . This represents an academic judgment by school officials, expert in the subjective evaluation of medical doctors, that [plaintiff] did not possess the attributes necessary to adequately perform his clinical duties.

*Fenje, supra*, at 625; *see also, Hajjar-Nejad*, *supra*, at *18 ("particularly for medical students, professional comportment issues fall under the umbrella of deference to academic decisions");

- 16 -

72973514.3

*Ewing, supra,* at 228, n. 14   (the school was "uniquely positioned to observe [the student's] judgment, self-discipline, and ability to handle stress, and thus especially well situated to make the necessary subjective judgment of [his] prospects for success in the medical profession"); *Firester v. Board of Governors of Wayne State Univ.*, 908 F.2d 973 (6th Cir. 1990) (rejecting the argument that a decision to dismiss a medical student for inappropriate behavior was not an academic one, merely because he had received a passing grade).

Moreover, just because Plaintiff completed his classes does not, in itself, mean that he is entitled to a degree.  *See, e.g., Rosenthal v. New York Univ.*, 482 Fed. Appx. 609, 614 (2d Cir. 2012) (upholding University's academic decision to deny an MBA candidate a degree, despite having completed all his coursework, because he pled guilty to insider trading).

Based upon the above-cited precedent, it is clear that the COS made a clearly academic decision that Plaintiff was not qualified to receive a medical degree.  If the University had wanted to make a disciplinary decision regarding Plaintiff, he could have been referred to the University's disciplinary body, the Judicial Board.  This action was not taken.  Instead, the COS made the academic decision that Plaintiff did not exhibit the professionalism needed to become a doctor.  Thus, because the decision was an academic one, in order to succeed, Plaintiff must prove more than a mere deviation from a stated policy or procedure to establish a breach of contract claim.  Instead, he must prove such a ***substantial departure*** from that promulgated policy or procedure that it demonstrates that the defendant was not actually exercising its academic, professional judgment.  *Ewing*, *supra*; *Pham*, *supra*.  He has not done so.

In the case at hand, there is no provision in the Handbook from which the COS departed, substantially or otherwise.  On the contrary, the Handbook specifically stated that the COS had

- 17 -

the discretion to dismiss a student for poor academic performance, including unprofessional behavior and judgment.  Plaintiff understood this policy.

Plaintiff does not and cannot cite to any section of the Handbook that restricts professionalism only to those acts occurring within the classroom or clinical setting.  Plaintiff does not and cannot cite to any section of the Handbook that states that the COS had no academic discretion and must award the medical degree if the student receives certain test and clinical scores.  And Plaintiff does not and cannot point to any credible evidence that suggests that the COS approved Plaintiff's graduation.

Similarly, Plaintiff does not and cannot cite to a single case that stands for the proposition that academic performance of a medical student can never include review of that student's behavior outside the classroom or clinical setting, and that a medical student is entitled to a mandatory injunctive awarding him a medical degree despite the school's professionalism concerns.  Instead, in his Brief, Plaintiff cites to a single case, *State ex rel. The Miami Student v. Miami Univ.*, 79 Ohio St.3d 168, 680 N.E.2d 956 (Ohio 1997) in an attempt to characterize the University's decision as non-academic. Plaintiff's reliance is misplaced, however, because this case is not even close to being relevant to the question here; that case deals not with a decision to dismiss a student, but rather what records are subject to FERPA.  Given the overwhelming precedent that directly addresses the issue at hand, which holds that decisions such as the one at issue here are academic in nature, Plaintiff's citation to *Miami* should be disregarded.

Likewise, Plaintiff makes the argument without legal citation that the Handbook should be construed against the School as being the drafter of the Handbook's language.  Such an assertion is contrary to established federal law holding that when a student challenges a dismissal decision, such decision should be afforded great deference regardless of whether the student's

- 18 -

claim is styled as a breach of contract claim based on the Handbook or some other asserted theory.  *See Paulin, supra.*

Because Plaintiff cannot establish success on the merits, his request for preliminary and permanent injunctive relief should be denied.

**B.      There Is No Irreparable Harm.**

Plaintiff also is not entitled to injunctive relief because he will not be irreparably harmed. Plaintiff was offered the opportunity to withdraw, which would have permitted him the chance to seek enrollment in another medical school.  Plaintiff has not submitted any evidence that he would have been unable to be admitted to another medical school had he withdrawn.  As a result, Plaintiff has not even attempted to meet his burden of proof on the facts.  Plaintiff also cannot claim irreparable harm when the timing of the COS decision was due to Plaintiff's own concealment of his drunk driving, arrest, and conviction.  Such unclean hands preclude any equitable relief.  *See J-Rich Clinic, Inc. v. Cosmedic Concepts, Inc.*, 98 Fed. Appx. 444, 447 (6th Cir. 2004).

**C.      Forcing The University To Issue Plaintiff A Degree Would Harm The University And Others.**

Plaintiff also is not entitled to injunctive relief because the relief he seeks would cause harm to both the University and others.  As discussed above, Plaintiff cannot succeed on the merits of his claim.  He seeks to upset the well-founded academic decision of the COS, which was based upon multiple incidents of unprofessional conduct.  The University should not be forced to issue a degree to which academic professionals have determined Plaintiff is not entitled.

Moreover, the University, and indeed, the public at large would suffer great harm should Plaintiff be awarded a degree that he is not qualified to receive.  If Plaintiff is permitted to

- 19 -

practice medicine when he is not qualified to do so, this could cause harm to the University's reputation because the University's name would be on Plaintiff's diploma.  Others would presume that this is the University's endorsement of Plaintiff's ability to conduct himself as a medical professional.  Further, potential patients of Plaintiff might suffer harm should he be permitted to practice medicine under the auspices of a degree from the University.  This risk is exemplified by the fact that Plaintiff has repeatedly acted unprofessionally and concealed bad behavior while under scrutiny as a student.  If this is how Plaintiff acts when under the watchful eye of the University, there is no telling what he will do once out on his own practicing medicine.  This risk should not be taken.

**IV.**    <u>**Conclusion**</u>

For the foregoing reasons, the University requests that this Court deny Plaintiff's motion for injunctive relief.

- 20 -

Respectfully submitted,


/s/ David H. Wallace
David H. Wallace (0037210)
Jennifer B. Orr (0084145)
Taft Stettinius & Hollister LLP
200 Public Square, Suite 3500
Cleveland, OH  44114-2302
Telephone: (216) 241-2838
Fax: (216) 241-3707
dwallace@taftlaw.com
jorr@taftlaw.com

Peter M. Poulos (0047210)
Chief Risk Management Officer
& Chief Litigation Counsel
Case Western Reserve University
10900 Euclid Avenue
Cleveland, Ohio 44106-7020
Telephone: (216) 368-0661
Fax: (216) 368-5481
peter.poulos@case.edu

*Attorneys for Defendant*
*Case Western Reserve University*

- 21 -

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2014, the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ David H. Wallace
One of the Attorneys for Defendant Case
Western Reserve University

## CERTIFICATE OF COMPLIANCE PURSUANT TO LOCAL RULE 7.1(F)

The undersigned hereby certifies that the foregoing complies the page limit of 20 pages, as set forth in Local Rule 7.1(F).

/s/ David H. Wallace
One of the Attorneys for Defendant Case
Western Reserve University

- 22 -

72973514.3