# EXHIBIT C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
FOR THE EASTERN DIVISION

| | |
|---|---|
| AMIR A. AL-DABAGH, | CASE NO. 1:14-CV-01046 |
| Plaintiff, | JUDGE JAMES S. GWIN |
| v. | |
| CASE WESTERN RESERVE UNIVERSITY, | AFFIDAVIT OF DR. SUSAN PADRINO |
| Defendant. | |

Dr. Susan Padrino, after being duly sworn, depose and state that I have personal knowledge of the factual assertions contained in this Affidavit.

1. I am currently the Assistant Dean for Clinical Sciences at the CWRU School of Medicine, and the Chair of the Committee on Students ("COS"). I have been the Chair of the COS since July of 2012 and before that I was a member of the COS since 2009. As the Assistant Dean for Clinical Sciences, I am well aware of the Professionalism standards of our curriculum. In addition, I am an Internist and Psychiatrist at University Hospitals Case Medical Center, practicing for the past 10 years. I have been a member of the Hospital's Wellness Committee (which, among other things, intervenes in cases of professionalism lapses by hospital clinicians) since 2011. I am also the Medical Director for the Internal Medicine Residency clinic and supervise residents, which requires me to be knowledgeable about professionalism standards at the level of residency training. These roles require me to evaluate people's behavior, motivation and appropriateness, and to measure these against a

technical or usual standard, from medical student to practicing clinician. A true and correct copy of my curriculum vitae is attached as Exhibit D to the University's Memorandum in Response to Plaintiff's Supplemental Memorandum in Support of Motion for Injunctive Relief (the "University's Memorandum").

2. The current members of the COS are listed on the roster attached as Exhibit B to the University's Memorandum.

3. Pursuant to the School of Medicine Student Handbook, the COS, comprised of nine voting faculty members and several non-voting *ex officio* members, is a standing committee of the Faculty of the School of Medicine, and is charged with the responsibility of reviewing the total performance of all students in the School of Medicine. A true and correct copy of the Student Handbook is attached as Exhibit A to the University's Memorandum, and is available on-line at http://casemed.case.edu/student_affairs/handbook. As expressly set forth in the Handbook, the total performance includes whether the student has acted in a professional manner.

4. As set forth in the Handbook, the COS has the sole responsibility for decisions regarding student standing, student promotions, and graduation. The COS makes the decision as to which students to recommend for an award of the degree of Doctor of Medicine, and no student receives this degree from the School without such a recommendation. In addition, as set forth in the Handbook, a student must satisfactorily complete all Basic Science and Clinical components of the School of Medicine curriculum. Those components of the curriculum expressly include professionalism.

5. The School of Medicine emphasizes the need for professionalism amongst its students from day one of medical school, and the requirement that students

2

72971639.4

act professionally remains in place until graduation day. Indeed, as set forth in the Handbook, professional behavior is listed as one of the technical standards that a student must possess for admission to the School; each incoming class takes an oath of professionalism upon admission; the first core competency of the curriculum is Professionalism; the COS reviews the student's compliance with that core competency of professionalism on an on-going basis from start to finish; and the COS decision to award the medical degree is a stamp of approval by the School that the student has met the professionalism standards. Professionalism includes behavior both inside and outside the classroom and clinical setting. Indeed, the very first incident that brought Plaintiff before the COS involved Plaintiff's interaction with a taxi cab driver that occurred outside the classroom/clinical setting. The COS has likewise reviewed numerous other students for unprofessional conduct occurring outside the classroom or clinical setting. Similarly, the ability of a student to obtain a clinical rotation during medical school, the ability of a medical student to obtain a residency, and the ability of a physician to maintain his license, can be negatively impacted by unprofessional behavior, such as drunk driving, that occurs outside the clinical setting.

6. Professionalism is such an important part of the School of Medicine's program that it is listed in the Handbook as the first of nine Core Competencies at the School of Medicine. A student will not be recommended for a degree if they do not fulfill all of the Core Competencies.

7. Plaintiff enrolled in the School of Medicine in the fall of 2009.

8. Throughout Plaintiff's time at the School of Medicine, he had numerous issues with professionalism, and was brought in front of the COS on three separate occasions. Plaintiff's lack of professionalism was especially concerning given his lack of

3

72971639.4

self-awareness, his willingness to make excuses for his behavior, and his willingness to either conceal information and/or change his story depending upon the circumstances.

9. In January 2012, Plaintiff was brought before the COS for professionalism issues because of several incidents arising on the night of the School of Medicine's Hippo Ball.

10. As a result of these incidents, on February 16, 2012, the COS unanimously passed a motion stating that:

> The School of Medicine requires an intervention on professionalism, as agreed by [Dr. Robert Haynie, Associate Dean for Student Affairs]. In addition, any further issues will result in them being reported and discussed at the COS Meeting with potential dismissal from Medical School.

A true and correct copy of the February 16, 2012 letter informing Plaintiff of the motion is attached as Exhibit J to the University's Memorandum.

11. In the fall of 2013, Plaintiff was brought before the COS again for professionalism issues.

12. Plaintiff had been enrolled in an acting internship, which is part of the School of Medicine's clinical curriculum.

13. At the end of Plaintiff's acting internship, Plaintiff's clinical teacher, Dr. Keith Armitage, gave Plaintiff a passing grade "with concerns" with regard to professionalism.

14. During this review, the COS gave serious consideration to dismissing Plaintiff from the School of Medicine, but ultimately decided to give Plaintiff another chance.

15. As a result, on November 21, 2013, the COS passed a motion stating that:

> Amir Al-Dabagh will be required to repeat the Internal Medicine Acting Internship based on initial poor performance

4

72971639.4

>and complete gender specific training as outlined by Kathy Cole-Kelly and Dr. Haynie. The results will be reviewed with COS at the January 2014 meeting, and an addendum will be made to the MSPE reflecting the student's professional behavior.

A true and correct copy of the November 22, 2013 letter informing Plaintiff of the motion is attached as Exhibit L to the University's Memorandum.

16. Plaintiff appealed the COS decision regarding the addendum to his MSPE letter.

17. On December 19, 2013, the COS informed the Plaintiff that it would not change its decision with regard to his MSPE. A true and correct copy of the December 19, 2013 letter informing Plaintiff of the COS decision is attached as Exhibit N to the University's Memorandum.

18. Plaintiff appealed this decision to the Dean of the School of Medicine, who allowed Plaintiff a chance to be heard again by the COS with a faculty member in attendance on his behalf.

19. After this second appeal, on January 30, 2014, the COS reaffirmed its decision to issue an addendum to Plaintiff's MSPE because of Plaintiff's pattern of unprofessional behavior. A true and correct copy of the January 30, 2014 letter informing Plaintiff of the COS's decision is attached as Exhibit O to the University's Memorandum.

20. On February 3, 2013, almost a year before Plaintiff's appeal, Plaintiff was arrested in North Carolina on suspicion of driving while impaired ("DWI") after a car accident.

21. Plaintiff was in North Carolina on behalf of the School of Medicine as a medical student performing research for another institution.

5

22. Plaintiff was found guilty of DWI, Careless & Reckless Operation, and Hit & Run on April 7, 2014. A true and correct copy of an April 9, 2014 letter from Plaintiff's criminal attorney is attached as Exhibit P to the University's Memorandum.

23. At no time during the pendency of his criminal case, after his conviction, or during his appearances before the COS, did Plaintiff report the issue to his Dean, Dr. Haynie, to the COS, or anyone else at the School of Medicine. The COS had concerns about Plaintiff's concealment of these facts given that Plaintiff was meeting with the COS about his lack of professional behavior and his plans to address his behavior at the same time this criminal matter was pending, yet he never mentioned this critical matter. The COS deemed this to be a serious lack of professionalism.

24. The School of Medicine was informed of Plaintiff's arrest and conviction around April 8 or 9, 2014, when the director of Plaintiff's upcoming residency at Riverside Hospital called Dr. Haynie to discuss the matter, assuming that he already knew of the problem.

25. As a result of Plaintiff's drunk driving, arrest and conviction, as well as his failure to report to the issue, Plaintiff was brought before the COS again on April 17, 2014. Each of those facts, by themselves, raises a serious professionalism issue. At that time, the COS passed the following motion:

> Amir Al-Dabagh will be dismissed from the medical school effective immediately, for continued and serious breaches in the code of conduct and standards of professionalism.

A true and correct copy of the April 18, 2014 letter informing Plaintiff of the COS decision is attached as Exhibit R to the University's Memorandum.

26. Plaintiff appealed that decision and the COS unanimously upheld its decision, but amended it to allow Plaintiff the option to withdraw instead of being

6

72971639.4

dismissed. The COS gave Plaintiff the opportunity to withdraw instead of a dismissal because the withdrawal would have given him a better opportunity to seek enrollment as an advanced standing student at another medical school. Although the COS did not deem Plaintiff as capable of remediation on professionalism at this point, the COS did not want to completely preclude such second chance if another school believed that remediation was possible at some point in the future. A true and correct copy of the May 8, 2014 letter informing Plaintiff of the COS decision is attached as Exhibit S to the University's Memorandum.

27. The Plaintiff was offered the option to appeal to the Dean of the School of Medicine, and was told that his degree could be awarded retroactively should he win his appeal. Plaintiff declined to appeal, stating he had no procedural grounds for an appeal.

28. As expressly set forth in the Handbook, a student cannot receive a MD degree unless, among other things, he (i) satisfactorily completes all basic science and clinical components of the School's curriculum, and (ii) if he is approved to graduate by the COS. The basic science and clinical components of the curriculum include the first core competency of Professionalism. Plaintiff did not complete the basic science and clinical components of the curriculum because of his lack of professionalism. In addition, the COS did not approve Plaintiff for the award of a medical degree. On the contrary, the COS voted on the fourth year students to be awarded degrees after the COS had voted to dismiss Plaintiff from the School. Thus, Plaintiff was not on the list of fourth year students approved by the COS for graduation. The letter sent to Plaintiff congratulating him for his research was not the COS approval for the award of the degree.

7

72971639.4

29. The 9 senior physicians of the COS each determined that Plaintiff does not meet the necessary academic standards for professionalism, and unanimously determined that he was not fit to be a doctor. The COS decision was based on the totality of Plaintiff's academic record, which included repeated unprofessional acts. It was not based simply on the criminal conviction; that was just one factor. The COS decision was based not only on the unprofessional acts that brought Plaintiff before the COS, but also on Plaintiff's repeated interactions with the COS and his statements to the COS that raised serious concerns about his ethics, integrity, and honesty. These 9 members have significant concerns about Plaintiff's honesty, integrity, self-reflection, overall professionalism, and did not feel he could be trusted with patient case as a medical doctor. It is those significant concerns that resulted in the dismissal decision.

30. The COS decision was not a disciplinary decision. On the contrary it was an academic decision. Although he could have, Plaintiff was not brought up for discipline by the separate University Judicial Board. The fact that drunk driving and related criminal activity are relevant to one's academic/professional standing, and is not simply a matter of discipline, is evident from the fact that the American Association of Medical Colleges standard application for medical schools asks the student-applicant if he has ever been convicted of a misdemeanor or felony; the hospitals ask for a criminal history check before allowing a medical student to do a clinical rotation as part of the clinical curriculum; and residency programs similarly ask for criminal background checks before allowing a medical student to start a residency. All of those criminal background checks are not limited to offenses occurring in the clinical setting. Further, the Ohio State Board may take action as to a physician's license based on alcohol related activity and other conduct occurring outside a clinical setting.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Dr. Susan Padrino

SWORN TO BEFORE ME and subscribed in my presence this 22nd day of ___May___, 2014.

_____
NOTARY PUBLIC

Renee A. O'Connor
Notary Public, State of Ohio
My commission exp. May 3, 2017

9

72971639.4