UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
-------------------------------------------------------
                                                    :
AMIR A. AL-DABAGH,                                  :
                                                    :     CASE NO. 1:14-CV-01046
              Plaintiff,                            :
                                                    :
vs.                                                 :     OPINION & ORDER
                                                    :     [Resolving Docs. 2, 12, 14, 15, & 16]
CASE WESTERN RESERVE                                :
UNIVERSITY,                                         :
                                                    :
              Defendant.                            :
                                                    :
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

       Against an unusual background, Plaintiff Amir Al-Dabagh claims Defendant Case Western

Reserve University School of Medicine broke a contract with him when it refused to award him a

diploma.  Similar issue have been presented in other cases but seldom with the same factual

background.

       Courts have reviewed claims that private universities wrongfully expelled students or

wrongfully refused to grant a diploma.  But most of those cases came after the university decided

that the student was not cutting the academic mustard.

       In contrast here, Case agrees that Plaintiff Al-Dabagh more than met all academic

requirements.  Reflecting this, in the days before it began expulsion efforts, Case wrote Al-Dabagh

that he had qualified for special recognition at graduation for the research he performed while in

medical school.

       Although Al-Dabagh successfully completed all the medical school curriculum; passed all

national tests; successfully completed his thesis; and paid all his fees, Case intends to deny Al-

Dabagh a diploma because Al-Dabagh failed to notify Case that he had been arrested in 2012 in

Case No. 1:14-CV-01046
Gwin, J.

North Carolina for driving  while impaired by alcohol.  And Case would deny the diploma though Case's own student handbook only required students to report convictions and did not require students to report arrests.

Although Al-Dabagh met all other University  requirements, Case says it requires students to demonstrate professionalism and Al-Dabagh was unprofessional when Al-Dabagh did not report the arrest.  Al-Dabagh had received earlier warnings regarding other conduct and Case says Al-Dabagh should have appreciated that he needed to report  the arrest in light of the earlier warnings, even though none of the earlier warnings said anything about such a duty to report.

In earlier periods of his training, Case warned Al-Dabagh after 1) he was late for three first year classes and he asked the class instructor not to mark him as late for at least one class; 2) he drank too much alcohol before going to a dance scheduled early in his training, then harassed two women students in an effort to dance with them, and finally leaped out of a moving taxi; 3) a not-identified student reported  that Al-Dabagh had led group discussions on patients without having personally examined the patients; and 4) a patient's family asked that Al-Dabagh not treat their relative although the family earlier asked that other physicians also be removed from treating their relative.

Although Al-Dabagh disputed some part of each of these incidents, Case says they give context to its decision to refuse a diploma for Al-Dabagh after he did not report the North Carolina arrest for driving   while impaired by alcohol.

Two incidents involved Al-Dabagh becoming drunk.  Neither of those incidents involved patient care or educational work.  And Case does not argue that it seeks to expel Al-Dabagh for alcohol problems.  Case says it "didn't believe he had an alcohol problem."  And  Case  says its

-2-

Case No. 1:14-CV-01046
Gwin, J.

decision "is not about alcohol per se."

So, this Court needs decide whether Case breached its contract when it refused a diploma. Case otherwise agrees that Al-Dabagh met all its graduation requirements except it says he did not show "professionalism."

The Court recognizes that educational institutions receive extreme latitude when deciding whether students meet educational standards.  But here, the Court considers what discretion courts should give educational institutions when the educational institution judges character, not academic competence.  So, this opinion first looks at how much discretion Case should receive when it's professionalism judgment really examines Al-Dabagh's character.  The Court then  considers whether Case abused that discretion when it refused Al-Dabagh the diploma he had otherwise earned.

For Al-Dabagh, the stakes are high.  Al-Dabagh completed (and paid for) five years of medical school.  He has successfully published more than a dozen articles or book chapters on dermatology, including an article published in one of the leading dermatology journals.  And the physician who supervised his dermatology research described Al-Dabagh as "quite the team player, . . . willing to lend a helping hand even without being asked to do so. He is well read, punctual and prepared for his clinics. His caring demeanor is apparent when he interacts with patients.  He exhibited a can do, help others spirit that has been a huge benefit to research projects, helping other students and faculty on collaborative review articles and original research."  If denied injunctive relief, Al-Dabagh's medical career will be lost or significantly diminished.

So the Court examines whether Case acted arbitrarily when Case found Al-Dabagh's failure to report the North Carolina arrest sufficiently shows a lack of professionalism that justified

-3-

Case No. 1:14-CV-01046
Gwin, J.

expelling Al-Dabagh only weeks before his graduation and only two months before he was scheduled to start his residency.

Plaintiff Amir Al-Dabagh attended Defendant Case Western Reserve University's School of Medicine for five years.  His elective course work focused on dermatology.  In April 2014, Case told Al-Dabagh that he would receive an honors designation for his research.  Riverside Hospital, Columbus, Ohio accepted Al-Dabagh to its dermatology residency program.

Within days of telling Al-Dabagh that he would receive an honors citation at his graduation, Case Western  told Al-Dabagh that it deny the diploma and would expel him unless he withdrew.

Al-Dabagh brings this lawsuit saying Case Western's Medical School breached its contract with him and violated its obligation of good faith and fair dealing in carrying out that contract.

Case responds that it denies a diploma because Al-Dabagh did not show "professionalism." Case relies upon four examples.  First, in his first year, Al-Dabagh was five to ten minutes late for a class and Al-Dabagh may have asked his instructor not to mark him late.  Second, Al-Dabagh went drunk to a school dance, harassed two women to dance with him, and may have grabbed another woman's behind and argued with that woman's date.  Later that night and while drunk, Al-Dabagh then tried to stiff a cab driver by rolling out of a moving cab to avoid paying his bill.  Third, an unidentified student said Al-Dabagh presented on a patient he had not personally examined.  Fourth, a patient's family asked that Al-Dabagh not treat their relative when Al-Dabagh was doing an internal medicine internship, likely for personality reasons.

Finally, Case decided to deny a diploma and expel Al-Dabagh after learning that Al-Dabagh had been involved in a February 2013 single car automobile accident and had been charged with driving under the influence of alcohol.  Case did not choose to expel Al-Dabagh for abusing alcohol

-4-

Case No. 1:14-CV-01046
Gwin, J.

but because he failed to report his arrest and the pending misdemeanor charges.  Case says Al-Dabagh's failure to report his arrest and the failure to report the pending misdemeanor case undermined his professionalism.

Al-Dabagh sues Case and seeks a permanent injunction compelling the School of Medicine to give him a diploma.  Case opposes the injunction.

For the reasons that follow, the Court **GRANTS** the request for a permanent injunction.

## I. Background

**A.    Factual Background**

Amir Al-Dabagh, a citizen of Michigan,[1] began attending Case Western Reserve University's School of Medicine in the Fall of 2009.[2]

Academically, Al-Dabagh performed well at Case Western's Medical School.  Describing Al-Dabagh in July 2012, Medical School Dean Haynie said: "Al-Dabagh is well-regarded by our faculty and administrators. . . . [H]is work is entirely satisfactory and he is performing at a high level in all of his required courses."  Describing Al-Dabagh in a 2011 letter, Dean Haynie summarized Al-Dabagh's academic performance: "As a medical student, Amir has continued his academic excellence having mastered both the science and clinical curriculum without any difficulty as well as continue his interest in research. . . . I can there for [sic] recommend Amir A. Al-Dabagh highly without any reservations."

Despite his academic standing, Case disciplined Al-Dabagh on several occasions.

---

[1] Al-Dabagh is a citizen of Michigan.  Case Western is a citizen of Ohio.  Case also represented that the value of one year of tuition at Case is over $50,000.  Because Al-Dabagh attended the University actively for four years, the Court finds that the parties are diverse and the amount in controversy of this breach of contract case exceeds $75,000.  Therefore, the Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1).

[2] Doc. 2-2, Al-Dabagh Decl. at 1 ¶ 3.

Case No. 1:14-CV-01046
Gwin, J.

In his first year, Al-Dabagh participated in a small group session, called an Inquiry Group.[3]
In January 2010, the faculty evaluator observed that Al-Dabagh showed up late "three times, from
10 to 25 min[utes] each time.  On one occasion he was supposed to be a leader, and the group could
not start on time."[4]  The evaluator also noted that "each time he came in late, Amir asked me for a
'private' talk and then asked [the evaluator] not to mark him late.  I consider this a more serious
breach of professionalism."[5]

Al-Dabagh acknowledges that he was late for three of the eleven sessions but says the time
was minimal.  And Al-Dabagh says that he only requested forbearance on one occasion when he
hosted a prospective student for the University.[6]  The University gives no evidence this explanation
is incorrect.

Al-Dabagh was late three times.  The Inquiry Group had eleven two-hour sessions so Al-
Dabagh missed only a small fraction of the group time.  Case recognizes the lost class time is
inconsequential but believed Al-Dabagh's request to avoid late markings had been dishonest.

In January 2012, Case disciplined Al-Dabagh. Plaintiff Al-Dabagh attended the School of
Medicine's "Hippo Ball."[7]  After the Ball, three students complained that Al-Dabagh was drunk at
the dance and harassed several women with dance requests.[8]  Another female student said that Al-
Dabagh touched her bottom without her permission.[9]  And that woman's date said he had a loud

---

[3] *See* Doc. 15-9.
[4] *Id.* at 1.
[5] *Id.* at 2.  Arriving late could affect a student's grade.  *Id.*
[6] Doc. 14-1, Al-Dabagh Decl. at 2 ¶ 12.
[7] Doc. 2-2, Al-Dabagh Decl. at 2 ¶ 11.
[8] Doc. 12-1 at 2.
[9] *Id.* at 4.

Case No. 1:14-CV-01046
Gwin, J.

confrontation with Al-Dabagh about the groping incident.[10/]

Al-Dabagh generally denied acting offensively and argued that faculty members present at the dance did not see any quarrels.[11/]

After the Ball, Al-Dabagh used a cab to go home.[12/] Intoxicated, Al-Dabagh apparently attempted to stiff the cab driver by using a $1 bill to pay a $20 fare. When the cab driver began to look for a police officer, he said Al-Dabagh opened the door and jumped from the vehicle.[13/] Bystanders called the police, and Al-Dabagh was taken to Cleveland Metro Hospital.[14/]

The Committee on Students—a collection of faculty "charged with the responsibility of reviewing the total performance of all students in the School of Medicine," with "authority for decisions on student standing and student promotions and graduation," and that "recommends to the Faculty of Medicine candidates for the award of the degree"[15/]—reviewed the incident relating to the Hippo Ball and the Inquiry Group tardiness issue.[16/] On February 16, 2012, the Committee "require[d] an intervention on professionalism" for Al-Dabagh and warned him that "any further issues will result in them being reported and discussed at the COS [Committee on Students] Meeting with potential dismissal from Medical School."[17/]

Al-Dabagh passed the next several years without any discipline issues at Case. Reflecting this, on July 24, 2012, Dr. Robert Haynie, Associate Dean for Student Affairs and a member of the

---

[10/]*Id.* at 3.
[11/]Doc. 2-2, Al-Dabagh Decl. at 2 ¶¶ 11-12.
[12/]*Id.* at 2 ¶ 13.
[13/]*Id.*
[14/]*Id.*
[15/]Doc. 2-8 at 1.
[16/]Doc. 15-5, Haynie Aff. at 3 ¶ 11.
[17/]Doc. 15-10 at 2.

Case No. 1:14-CV-01046
Gwin, J.

Committee on Students, sent a recommendation letter on Al-Dabagh's behalf to the American

Academy of Dermatology.[18]  Dr. Haynie said that Al-Dabagh's "work is entirely satisfactory and

he is performing at a high level in all of his required courses."[19]  The letter did not mention any

concerns about Al-Dabagh's professionalism.

Starting in June 2012, Plaintiff Al-Dabagh spent a year at Wake Forest University on a

research fellowship and later a paid position.  While at Wake Forest, Wake Forest paid Al-Dabagh

although Al-Dabagh paid a small amount of tuition to Case, and he received some academic credit

for his time doing dermatology research at Wake Forest.[20]

On February 3, 2013, and while employed by Wake Forest and while in North Carolina, Al-

Dabagh crashed a vehicle into a telephone pole, and was arrested.[21]  It was a single car collision and

no one was hurt.  Police charged him with driving while impaired.[22] The charge remained pending

for more than a year without resolution.  Al-Dabagh did not tell Case about the incident.

When Al-Dabagh returned to Case from Wake Forest, he began receiving clinical instruction

.[23]  During this return for clinical instruction, Al-Dabagh did an internal medicine rotation and

received a critical evaluation after a patient's family complained about him.

Apparently, the patient had competency issues.  The patient's family complained about Al-

Dabagh's treatment.  Also, an anonymous evaluation said several hospital staff members made

several complaints about Al-Dabagh's treatment of staff.

--------

[18]/Doc. 10-6.

[19]/Id.

[20]/Id. at 1 ¶ 4; Doc. 2-6 at 2.

[21]/Doc. 2-2, Al-Dabagh Decl. at 3 ¶¶ 20-21.

[22]/Doc. 2-2, Al-Dabagh Decl. at 3 ¶¶ 20-21.

[23]/Id. at 2 ¶ 15.

Case No. 1:14-CV-01046
Gwin, J.

In response, Al-Dabagh said the patient had been difficult, especially for a student new to this internal medicine rotation.  He also argued that the patient's family had already "fired" nurses and physicians who had given care to the patient.  Al-Dabagh also said that he faced a situation where two attending nurses gave contrary recommendations regarding whether a PICC (peripherally inserted central catheter) should be inserted.  Case had no additional information about the incident.

After the incident involving the patient family's complaint, the Committee on Students met again concerning Al-Dabagh and required him to repeat the rotation and to complete gender specific training.[24]

The Committee also added an addendum to his Medical Student Performance Evaluation (MSPE) letter.[25]  Medical schools provide MSPE letters to specialty residency programs considering medical student applications.[26]  The Addendum noted that Al-Dabagh received a satisfactory grade with concerns during the internal medicine rotation and that Case required him to repeat the internal medicine internship.[27]  Upon repeating the internship, Case again passed Al-Dabagh with concerns but said Al-Dabagh "did show improvement compared to the first rotation."[28]

Case best summarizes Al-Dabagh's performance in medical school in its MSPE letter:

Mr. Amir Al-Dabagh is a bright, hardworking, caring, senior medical student who has demonstrated consistent growth in his approach to his medical education.  His performance in the core clinical clerkships has predominately fallen in the commendable range.  Mr. Al-Dabagh possesses a solid knowledge base and growing clinical acumen including mature clinical judgment.  His interpersonal skills are strong and he works well with patients and members of the healthcare team.  It is a

---

[24]/*Id.* at 5-6 ¶¶ 19-20; Doc. 15-12 at 2.
[25]/Docs. 15-5, Haynie Aff. at 5-6 ¶¶ 19-20; 15-12 at 2.
[26]/Doc. 15-5, Haynie Aff. at 6 ¶ 21.
[27]/Doc. 15-13 at 5.
[28]/Doc. 15-13 at 8.

Case No. 1:14-CV-01046
Gwin, J.

great pleasure to present Mr. Al-Dabagh to you as an excellent candidate for
residency training.[29]

Rather than alter any of that glowing language, the University's added an "ADDENDUM"

after the summary, which discussed Al-Dabagh's internal medicine rotation:

At our Committee on Students' recommendation, this addendum is being added to
Amir Al' Dabagh's medical student performance evaluation.  Amir was presented
to this committee on November 22, 2013 as a result of his medicine AI (acting
internship) performance at University Hospitals of Cleveland.  Our rotation grading
is as follows: H (Honors), C (Commendable), S (Satisfactory), U (Unsatisfactory),
and Satisfactory with Concerns.  Amir received a Satisfactory with Concerns as a
result of issues raised by his attendings and other staff.  Once Amir was made aware
of these concerns, he did improve to the point of passing the rotation.  However,
given several earlier concerns, the Committee on Students recommended that Amir
repeat the rotation and work on other corrective actions as outlined by one of our
senior faculty members who sits on the Committee on Students.  On the repeat of the
acting internship, Amir again received a grade of passing with concerns, but he did
show improvement compared to the first rotation.[30]

So heading towards graduation, Plaintiff Al-Dabagh had successfully completed all diploma

requirements.  But during his five years of medical training, Case had disciplined Al-Dabagh for

trying to cover three late attendances; for rude behavior at a dance where he had likely been drunk;

for trying to skirt a cab fare by idiotically leaving a moving car; for complaints from a patient's

family; and for giving patient case summaries where he might not have personally examined the

patient.

On April 7, 2014, a North Carolina state court convicted Al-Dabagh of Driving While

Impaired and an additional Careless and Reckless finding, both misdemeanors.[31]  He received a 120-

day suspended jail term, one year of unsupervised probation, 48 hours of community service, a

[29]/*Id.* at 5.
[30]/*Id.*
[31]/Docs. 2-13, Roberts Aff. at 1 ¶¶ 4-5; 15-16 at 2.

-10-

Case No. 1:14-CV-01046
Gwin, J.

substance abuse assessment, a fine, and court costs.[32]  On April 9, 2014, Al-Dabagh's lawyer emailed a letter to Al-Dabagh summarizing the outcome of the case.[33] The letter suggests that Al-Dabagh had not been present when the North Carolina court reached its verdict or entered its judgment.

Regarding timing, the North Carolina court apparently decided Al-Dabagh's case on April 7, 2014, and on a submission.  On April 9, 2014, Al-Dabagh's attorney notified Al-Dabagh of the conviction by email.

Al-Dabagh notified Riverside Hospital, the site of his residency program.[34]  Al-Dabagh says he intended to notify Case but the director of Riverside's residency program called Dr. Haynie first. Riverside called Dr. Haynie most likely on April 9, 2014.[35]

So Al-Dabagh first knew of the conviction on April 9, 2014.  Likely, he called Riverside Hospital the same day to report the conviction.  And Al-Dabagh had not reported the conviction to Dr. Haynie before Riverside told Dr. Haynie about the conviction, likely on the same day, April 9, 2014.

On April 10, 2014, Case sent Al-Dabagh a letter telling Al-Dabagh that he had qualified to receive an award certificate for "Honors with Distinction in Research" that would be awarded at graduation.[36] Dr. Haynie signed the letter together with other medical school deans.

However, on April 14, 2014, the University sent Al-Dabagh a notice that the Committee on

---

[32]/Doc 15-16 at 2.

[33]/*Id.*

[34]/Doc. 2-2, Al-Dabagh Decl. at 3 ¶ 27.

[35]/Doc. 15-5, Haynie Aff. at 8 ¶ 30.

[36]/Doc. 2-7.

Case No. 1:14-CV-01046
Gwin, J.

Students would review his "progress in medical school and may issue sanctions" over professionalism issues based on the DWI conviction.[37]

After an April 17, 2014, meeting, the Committee voted to dismiss Al-Dabagh from the University for "continued and serious breaches in the code of conduct and standards of professionalism."[38]  The Committee later amended its decision to allow Al-Dabagh the opportunity to withdraw.[39]  Case's graduation occurred on May 17, 2014, and Al-Dabagh was not given a diploma.  He is scheduled to begin a residency program at the Riverside Hospital in Columbus on June 17, 2014, although he cannot do so if he does not receive a diploma from Case.[40]

**B.    Case's Policies**

The University's School of Medicine has a Student Handbook.[41]  The Handbook says its terms are not a contract,[42]    Despite these disclaimers, Case's relation with Al-Dabagh was contractual although the terms of that contract must be interpreted against the educational background the parties shared.[43]

---

[37]/Doc. 2-14.

[38]/Doc. 2-15.

[39]/Doc. 2-16.

[40]/Doc. 2-2, Al-Dabagh Decl. at 4 ¶¶ 29-30.

[41]/*See* Doc. 15-1.

[42]/*Id.* at 2.

[43]/*See Bleicher v. Univ. of Cincinnati College of Med.*, 78 Ohio App. 3d 302, 308 (1992) ("It is axiomatic that '* * * when a student enrolls in a college or university, pays his or her tuition and fees, and attends such school, the resulting relationship may reasonably be construed as being contractual in nature.' The terms of the contract between the university and the student are generally found in the college catalog and handbooks supplied to students."); *Cornett v. Miami Univ.*, 728 N.E.2d 471, 473 (Ohio Ct. Cl. 2000) ("It is well recognized that when a student enrolls in a college or university, pays his or her tuition and fees, and attends the school, the resulting relationship is construed as contractual in nature."); *Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir. 1998) (college-student relationship is essentially contractual in nature); *Russell v. Salve Regina College*, 890 F.2d 484, 489 (1st Cir. 1989) (state contract law governs student and university relationship); *Holter v. Univ. of Chicago*, 751 F. Supp. 1294, 1300 (N.D. Ill. 1990) ("Under Illinois law, a university and its students have a contractual relationship; the terms of their contract are generally set forth in the university's catalogs and manuals.").

Case No. 1:14-CV-01046
Gwin, J.

The Student Handbook describes the requirements to graduate.[44] Plaintiff Al-Dabagh satisfied all Case's requirements except the requirement that he be approved by the Committee on Students.

The Case Western Medical School Handbook says that the Committee on Students will consider professionalism when it decides whether to approve a student for graduation. The Handbook defines "Professionalism" as:

> Consistently demonstrates ethical, honest, responsible and reliable behavior.
>
> Identifies challenges to professionalism and develops a strategy to maintain professional behaviors when adherence to professional standards is threatened in the clinical and/or research settings.
>
> Engages in respectful dialogue with peers, faculty and patients, to enhance learning and resolve differences.
>
> Recognizes personal limitations and biases and finds ways to overcome them.[45]

As earlier described, to graduate, a student must complete all parts of the school's curriculum, pass the national medical examinations, complete a thesis, meet all financial obligations, and "[b]e approved to graduate by the Committee on Students."[47]

---

[44] The Student Handbook says the graduation requirement are:

In order to receive the MD degree from the Case Western Reserve University School of Medicine, students must:
1. Satisfactorily complete all Basic Science and Clinical components of the School of Medicine curriculum
2. Pass the USMLE Step 1 and USMLE Step 2 CK and CS.
3. Satisfactorily complete their MD Thesis
4. Meet all financial obligations in a timely fashion to the University
5. Be approved to graduate by the Committee on Students

Doc. 2-4 at 1.
[45] *Id.* at 42, 49, 93.
[47] *Id.* at 61.

Case No. 1:14-CV-01046
Gwin, J.

The Committee on Students has nine voting members and several non-voting members.[48/] The Committee reviews student performance, including "professional attitudes and behavior as well as compliance with the University's Standards of Conduct."[49/] "Medical school education entails the mastery of didactic, theoretical, and technical material, as well as the demonstration of appropriate professional and interpersonal behavior, sensitivity, sense of responsibility, and ethics, and the ability to conduct oneself suitably with patients, colleagues, co-workers and others. Unprofessional activities may also be subject to a formal university disciplinary action."[50/]

Therefore, the Committee may "question the student on any matter relevant to the student's academic performance, Standards of Conduct violations, professional behavior or attitudes."[51/] "The Committee on Students acts on behalf of the Faculty of Medicine in non-academic disciplinary matters involving medical students. The Committee on Students will uphold the Standards of Conduct and Judicial procedures" as described in the undergraduate handbook.[52/]

The undergraduate handbook defines "Conduct that is subject to university disciplinary action" as including, among other things, "All forms of dishonesty" and "Violations of law on university premises or in connection with university functions."[53/]

The School of Medicine's Handbook also tells students to "notify their Society Dean of any new misdemeanor or felony convictions . . . since matriculation."[54/] No provision requires students

---

[48/]*Id.* at 59.

[49/]*Id.*

[50/]*Id.* The Handbook also refers students to the University Disciplinary process.

[51/]*Id.* at 60.

[52/]*Id.*

[53/]Doc. 2-18.

[54/]Doc. 15-1 at 72 (emphasis added)

-14-

Case No. 1:14-CV-01046
Gwin, J.

to report arrests.

## C.      Procedural History

On May 14, 2014, Al-Dabagh sued Case for breach of contract and moved for a temporary restraining order and a preliminary injunction.[55/]  Al-Dabagh sought an order from this Court that Case issue him a diploma and barring Case from dismissing him or telling anyone he has been dismissed.[56/]

On that same day, in light of the serious harm that would come to Plaintiff's career should he be dismissed, the Court temporarily restrained the Case from dismissing him or telling anyone that he had been dismissed until a subsequent hearing.[57/]

On May 19, 2014, Case consented to a continuation of the temporary restraining order, and both parties agreed to consolidate the expedited proceedings for the preliminary and permanent injunction.[58/] The parties also agreed to submit exhibits and declarations.

After full briefing, the Court held oral argument on whether an injunction should issue requiring Case to grant a diploma to Al-Dabagh.[59/]

## II. Legal Standard

In order for the Court to grant injunctive relief to Plaintiff Al-Dabagh, the Court must consider four factors: 1) the likelihood of success on the merits; 2) whether irreparable injury would come to Plaintiff that cannot be remedied with damages if the injunction does not issue; 3) whether

---

[55/]Docs. 1 (complaint); 2 (motion for preliminary injunction); 3 (motion for temporary restraining order).
[56/]Docs. 2; 3.
[57/]Doc. 9.
[58/]Doc. 13 at 1.
[59/]See Doc. 17.

Case No. 1:14-CV-01046
Gwin, J.

substantial harm would come to Defendant and others if the injunction issues; and 4) the public

interest.[60]

### III. Analysis

**A.      Success on the Merits**

Plaintiff Al-Dabagh says that the Case's decision to deny him a diploma is a breach of the

contract that he has with the University.[61]

When a student challenges a university's actions on the basis that those actions constitute

a breach of contract,

> great deference is accorded a university when making decisions that pertain to the
> academic performance of students and their entitlement to promotion or graduation.
> Thus, a reviewing court is not to disturb a genuinely academic decision unless "it is
> such a substantial departure from accepted academic norms as to demonstrate that
> the person or committee responsible did not actually exercise professional
> judgment." The standard of review, therefore, is not merely whether a court would
> have decided the matter differently but, rather, whether the university's action was
> arbitrary and capricious.[62]

However, when a university purports to withhold a degree for non-academic reasons, courts

review university actions more stringently.[63]  Given the limitation of "arbitrary and capricious"

review to "genuinely academic decisions,"[64] no reason exists to think that Ohio courts would do

---

[60]*See* Jolivette v. Husted, 694 F.3d 760, 765 (6th Cir. 2010).

[61]Doc. 1 at 5-7 ¶¶ 31-49.  Al-Dabagh also says he is entitled to damages and a declaratory judgment.  If the Court grants the injunctive relief requested, these types of relief are unnecessary.

[62]*Pham v. Case W. Reserve Univ.*, No. 71083, 1997 WL 156689, at *2 (Ohio Ct. App. Apr. 3, 1997) (quoting *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985)).  Case Western argues that Al-Dabagh cannot rely on any of the student handbooks because they contain a disclaimer that says the handbooks do not constitute an offer or a contract.  Doc. 15 at 19.  However, Ohio courts do treat handbooks and bulletins as creating contractual terms, *see Pham*, 1997 WL 156689 at *3, so this Court will as well.

[63]*See* Jayme L. Butcher, Comment, *MIT v. Yoo: Revocation of Academic Degrees for Non-Academic Reasons*, 51 Case W. Res. L. Rev. 749, 759-61 (2001).

[64]*Pham*, 1997 WL 156689 at *2.

Case No. 1:14-CV-01046
Gwin, J.

differently.

Case says that it is entitled to full deference to its decision to dismiss Al-Dabagh because it based its decision on its determination that Al-Dabagh did not demonstrate "professionalism."[65/]

While Case should receive great discretion in judging academic standards, the determination of "professionalism" goes well beyond academic or patient related matters. The University's definition of "professionalism" expresses a moral judgment, rather than an evaluation against a set of specialized criteria. Case describes professionalism in moral judgment terms: "ethical, honest, responsible and reliable behavior"; "respectful dialogue"; "personal limitations and biases"; and "professional and interpersonal behavior, sensitivity, sense of responsibility, and ethics, and the ability to conduct oneself suitably."

Although courts should give almost complete deference to university judgments regarding academic issues, the same deference does not follow university character judgments, especially on character judgments only distantly related to medical education.

Ultimately, Case denied Al-Dabagh a diploma because it believed he should have reported an out-of-state arrest and prosecution for driving while impaired that had not yet concluded and despite University Handbook provisions that did not require an arrest be reported. It also believed he earlier dissembled regarding being late for class and earlier dissembled by giving summaries on patients when he might, or might not, have examined the patient before giving the summary.

Medical schools have no special expertise regarding judging character for honesty. When the university bases its judgments on a student's character, the university lacks the expertise that

---

[65/]Doc. 15 at 19. Case Western appears to have abandoned its claim that it could dismiss Al-Dabagh for violating the student code of conduct.

Case No. 1:14-CV-01046
Gwin, J.

warrants deference.[66]

Accordingly, although the Court will review the University's decision with deference, the Court will probe Case's explanations more closely because Case voted to dismiss Al-Dabagh for his lack of "professionalism" rather than his in-class performance. And in considering his "professionalism," Case almost completely focused on whether Al-Dabagh was honest.

The University argues that Al-Dabagh's record at Case shows that he has a character lacking honesty.

The importance of the previous incidents considered by the Committee on Students is belied by Case's letters of recommendation. After Al-Dabagh allegedly harassed two female students, allegedly almost engaged in a physical confrontation with another male student, and allegedly leaped from a moving taxi cab to avoid paying his fare, Dr. Haynie told potential employers that Al-Dabagh's "work is entirely satisfactory and he is performing at a high level in all of his required courses" and made no mention of any concerns regarding professionalism.[67]

And after the Committee on Students saw Al-Dabagh for a second time concerning his internal medicine rotation, the Committee only added an addendum to an otherwise glowing recommendation. That letter did not mention any concerns with professionalism, just vague "issues" and "concerns."[68] The addendum, completed in January 2014, mentions nothing other than Al-Dabagh's redoing an acting internship rotation.

The University argues that these glowing letters show that Case attempted to support its

---

[66]/*See Ewing*, 474 U.S. at 225 ("accepted academic norms" and "actually exercise professional judgment").
[67]/Doc. 10-6..
[68]/Doc. 15-13 at 5.

-18-

Case No. 1:14-CV-01046
Gwin, J.

students as much as possible, not that the Committee was not concerned about the incidents.

Obviously, this argument proves too much.  Case's argument implies that Case Medical held grave concerns regarding Al-Dabagh but then misrepresented to residency programs by omitting the school's true opinion regarding Al-Dabagh's qualifications.  And the University made these representations to residency programs regarding the highly important choice of which students should be selected for residency programs.

While saying that candor is essential, Case Western Medical School gave a most important evaluation that Case now says did not truly reflect its opinion.   Against such a backdrop, the University's argument that Al-Dabagh's lack of complete condor on the  arrest for driving while impaired disqualifies him from practicing medicine is not persuasive.

So, Case Western Reserve Medical School failed to disclose concerns to residency programs. This leads to two alternative explanations.  If the earlier incidents were actually no big deal, then the earlier incidents do not warrant expulsion even when followed by Al-Dabagh's failure to report the North Carolina arrest.  Alternatively, if the earlier incidents were important, then Case cannot rely on any lack of candor because Case demonstrated worse in giving glowing recommendations without mention of Al-Dabagh's supposed character flaws.  That Case did not to explain any concerns to potential residency programs shows these incidents were more innocuous than the University now argues.

With respect to being late three times for the small group sessions and requesting not to be marked as late for at least one of those sessions, Case appears never to have asked Al-Dabagh about the incidents.  Case does not show that Al-Dabagh lied when he explained that he needed to wait for a person he was hosting on behalf of the University.  The faculty member recalled that Al-

-19-

Case No. 1:14-CV-01046
Gwin, J.

Dabagh requested not to be marked late for more than one session, perhaps two additional sessions. Even if the faculty member could accurately recall, it is difficult to see any such request as sufficient to disqualify a bright, highly praised student from graduation.

Additionally, when Al-Dabagh was asked to leave a patient's room,  Case has no information on whether the same family had earlier asked other physicians to leave, as Al-Dabagh says.  And Case  gives no evidence whether the family so mistreated the earlier physician that the physician came to tears.

And although Case says that Al-Dabagh suggested that he had examined patients before presenting the patient's case to other students and instructors, the only basis for that statement appears to be an anonymous statement, and Case  has no idea how many times this behavior happened, if it did at all.  Also, Case does not say that medical students could not present a patient's case after reviewing the patient's file, lab work and test results.  In addition, Case gives no evidence that Al-Dabagh made mistakes in his presentations.

This leaves Al-Dabagh's conduct at the Hippo Ball and Al-Dabagh's subsequent taxi ride. If the conduct occurred, the conduct was obviously improper.  But the conduct implicates alcohol abuse and harassment of peer women.  Al-Dabagh completed counseling regarding his conduct. Case apparently believed Al-Dabagh's conduct on the night of the Hippo Ball was not important enough to tell residency programs.

Accordingly, the only question remaining is whether Al-Dabagh's conviction for driving while impaired and decision not to tell Case about the arrest sufficiently support his expulsion and sufficiently support denying him a diploma.

Before his conviction, the University Handbook did not require Al-Dabagh to inform the

-20-

Case No. 1:14-CV-01046
Gwin, J.

University of his arrest.  The Handbook specifically tells students they do not need to report a crime until they have been convicted.[69]  And Case has presented no evidence that the Committee on Students ever required Al-Dabagh to report arrests, not just convictions.

And the Court declines to find the minimal delay in reporting the conviction important.  Al-Dabagh learned of the conviction by email on April 9, 2014.  He immediately informed the Riverside residency program.  And nothing disproves his statement that he was going to tell Case but Case had otherwise learned of the conviction after a call from the Riverside Dermatology Program Director on April 9, 2012.  Likely, that Director called Case immediately after learning of the conviction on April 9, 2014.

Case learned of the conviction on April 9, 2014, the same day Al-Dabagh learned of the conviction.  The University then reached out to Al-Dabagh.  Nothing shows Al-Dabagh would not have later revealed the conviction to Case.

What remains, then, is to consider whether the University was entitled to believe that the failure to report the February 2013  arrest combined with other so-called "professionalism" incidents—that Case did not feel the need to note in its recommendations of Al-Dabagh—demonstrated that Al-Dabagh did not fulfill the core competency of "professionalism."

If the Court were not giving Case great discretion, the decision would be easy.  Given Al-Dabagh's significant accomplishments, especially in dermatology research; given his grades; given his especially positive review by the Dermatology Professor supervising his research, the Court would quickly grant the requested relief.

But we give Case great discretion and this discretion makes this decision a closer question.

---

[69]/Doc. 15-1 at 72.

-21-

Case No. 1:14-CV-01046
Gwin, J.

In his medical school years, Al-Dabagh twice had significant judgment issues with alcohol use, if not an addiction or dependency.  But Case does not say Al-Dabagh's alcohol use disqualifies him. Other students and staff physicians have had dependency issues and have worked through those problems.

Regarding the other past incidents, the Court finds them insufficient to justify expelling a student who has successfully completed five years of medical school, a student who has conducted and published significant amounts of research; and a student who the Wake Forest supervising dermatologist described as:

> He is well read, punctual and prepared for his clinics. His caring demeanor is apparent when he interacts with patients.  He exhibited a can do, help others spirit that has been a huge benefit to research projects, helping other students and faculty on collaborative review articles and original research.  Amir was a pleasure for me to work with. He has a very bright, inquisitive personality, finding joy in life and work. He has a broad view of the importance of medicine, both for the individual and for society.[70]

Given the way Case treated the previous incidents together with the nature of those incidents, the University acted arbitrarily and capriciously in finding Al-Dabagh did not satisfy the core competency of "professionalism."

Because the "professionalism" issue is the only issue Case uses to justify its withholding the degree, the Court finds that Al-Dabagh has satisfied all of the University requirements to graduate and receive his diploma.  Therefore, Al-Dabagh is likely to succeed on his breach of contract claim for the University's denial of a diploma.

## B.    Irreparable Harm to Plaintiff

The Court previously discussed the irreparable harm that would come to Al-Dabagh if he

---

[70]Doc. 14-3.

Case No. 1:14-CV-01046
Gwin, J.

were not to receive a diploma: he would not be able to start his residency on June 17, 2014.  More than likely, Al-Dabagh's whole career would be significantly damaged, if not lost.

Although in its opposition Case  suggests that Al-Dabagh could seek admission to another medical school university,[71] at the hearing, Case represented to the Court that Al-Dabagh would likely need to repeat the last two years  if he were to transfer.

Accordingly, the Court finds that Al-Dabagh will suffer irreparable harm if an injunction does not issue.

**C.      Substantial Harm to Defendant**

Defendant gives only vague argument regarding how Defendant would be damaged if it were required to issue a degree.  Mostly, Defendant says it would suffer damage if persons (read judges) who were not academic physicians could second guess Defendant's decisions.

But that is nothing more than arguing that Case Western Medical School will suffer irreparable injury if someone disagrees with it.  Recall that just weeks before graduation, Defendant told the world that

> Al-Dabagh is a bright, hardworking, caring, senior medical student who has demonstrated consistent growth in his approach to his medical education.  His performance in the core clinical clerkships has predominately fallen in the commendable range. Mr. Al-Dabagh possesses a solid knowledge base and growing clinical acumen including mature clinical judgment.  His interpersonal skills are strong and he works well with patients and members of the healthcare team.  It is a great pleasure to present Mr. Al-Dabagh to you as an excellent candidate for residency training.

The Court sees no irreparable injury to the University if it must issue a diploma to a student the

---

[71]/Doc. 15 at 23.

-23-

Case No. 1:14-CV-01046
Gwin, J.

University found had these qualities.[72]  And, the Court has already determined that Case  only

arbitrarily and capriciously believes he is not qualified under the University's curricular standards.

The Court also finds that any reputational harms are minimal; Case has made a record of its

opposition to the granting of a diploma, and many levels exist between his diploma and Al-Dabagh's

practice of dermatology, including his residency programs and the state licensing authority, which

will apparently conduct a criminal background check and see the driving while impaired conviction.

And, Riverside already has knowledge of the conviction.

Accordingly, the Court finds that Case will not be substantially harmed by the issuance of

an injunction.

**D.     Public Interest**

The Court finds that the public interest favors the issuance of an injunction.  Al-Dabagh

shows ability, especially in the dermatology research he aims to pursue.  He also shows failings,

especially alcohol abuse.

But on balance, the public will benefit if Al-Dabagh's five years of medical education is not

thrown away.  He may need supervision.  Presumptively his residency program and state licensing

authorities will provide it.  The public interest favors the issuance of an injunction.

## IV. Conclusion

Because the Court finds that the University has arbitrarily and capriciously denied Plaintiff

Al-Dabagh a diploma and each factor of the Rule 65 test for a permanent injunction supports the

issuance of a permanent injunction, the Court **ORDERS** Case Western Reserve University to issue

---

[72]/*Id.* at 23-24.

-24-

Case No. 1:14-CV-01046
Gwin, J.

a diploma to Amir Al-Dabagh as having satisfied the requirements to become a doctor of medicine

and to list Al-Dabagh as having graduated in whatever ways are customary for the school.

      IT IS SO ORDERED.


Dated: June 2, 2014                      _s/_            _James S. Gwin_
                                        JAMES S. GWIN
                                        UNITED STATES DISTRICT JUDGE